**2022 UT App 56**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
TIMOTHY LAVELL DICKERSON,
Appellee.

Opinion
No. 20191052-CA
Filed May 5, 2022

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 191401450

Sean D. Reyes and David A. Simpson,
Attorneys for Appellant

Douglas J. Thompson, Attorney for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1 After being charged with enticement of a minor, attempted sodomy on a child, and various drug-related offenses, Timothy Lavell Dickerson moved to dismiss the charges, claiming that a law enforcement officer had entrapped him into committing the offenses. The district court denied his motion as to the drug charges but granted it as to the enticement and sodomy charges. The State now appeals. We reverse and remand for further proceedings.

BACKGROUND

¶2    The Utah Attorney General's Internet Crimes Against Children (ICAC) task force "fight[s] the sexual exploitation of children online." In May 2019, an ICAC special agent was using an online persona he had created to pose as a thirteen-year-old girl on various platforms. The agent explained that, because on "a lot of these platforms you have to put your age as eighteen," he would do so and then, "once a conversation engages or starts," he would "reveal [the girl's] real age" as thirteen.

¶3    When he encountered Dickerson, the special agent was using the alias "Kailey" on a dating app. The agent created a profile for Kailey using the profile name "kaileyjojo." The profile listed Kailey's age as eighteen and included a "closeup, selfie-type picture" of a West Valley City police officer who was in her twenties. Besides closely cropping the photo, the agent did not alter it in any way. The district court later found that the female in the profile photo "appear[ed] to be at least 18 years of age, if not older."

¶4    Dickerson contacted Kailey using the profile name "Lavell." Users of the dating app could contact each other by "clicking on a person's page and then initiating" a "direct chat" from there. After the initial contact, the following exchange occurred:

> Dickerson: O ok then wat u did today
>
> Kailey: I went to school and moved stuff in my room
>
> Dickerson: o ok then wat u go to school for
>
> Kailey: I'm in middle school
>
> Dickerson: Girl stop

Dickerson: Stop play

Kailey: No for real

Dickerson: So is that really a pic of u

Kailey: Yeah

Dickerson: So how old r u baby

Dickerson: Hello

Dickerson: I didn't scare you off did it

Kailey: I'm here

Kailey: I'm 13

Dickerson: Forreal stop playin

Dickerson: So y it say 18 baby

Kailey: I'm serious

Kailey: I'm 13

Dickerson: O ok so wyd on here baby

Kailey: Looking for whatevs

Kailey: Idk really

Kailey: U?

Dickerson: O ok u smoke or drink

Dickerson: The same as u love

Dickerson: I'm not from here and I need a friend

Kailey: I've smoked before

Kailey: Oh cool

Kailey: Where u fro

Dickerson: Who u stay wit

Dickerson: Atlanta

Dickerson: Wat part u stay in

Dickerson: How long u been here

Dickerson: Hello u there

Kailey: I live in Provo with my dad

Dickerson: O ok then can u get of the house

Kailey: Yeah

Dickerson: I'm forreal boo

Kailey: Me to

Kailey: What u wanna do

Dickerson: U ever been with a black dude

Kailey: Lol

Kailey: Never

Dickerson: U want to smoke or what boo

Dickerson: Forreal

Kailey: I'll smoke

The agent testified that Dickerson then "asked for my number, and I gave it to him, and it led on to text messaging."[1]

¶5 Over text messages, Dickerson suggested that they meet up and smoke some marijuana and asked Kailey, "wat else can we do baby"? Kailey's responses were hesitant, claiming that she had "never really snuckout" before. Kailey told Dickerson she was "kinda scared" because "i dont know what u wanna do" and "ive never been with a oldr guy." Dickerson asked, "Wats the oldest baby and I promise u on my granny I won't hurt or nun. . . . Send me the address baby." After Kailey replied that the oldest "was 13 in my grade," Dickerson again asked for the address.

¶6 Kailey told Dickerson that her "bff has a older boyfriend and she likes it." Dickerson replied, "O she do huh and you will like it too baby." He continued to press Kailey for the address. When Kailey asked, "r u gonna try stuff with me after we smoke? lol," Dickerson asked, "Do u want me to baby"? He assured her that they could do "Wateva u want baby" and "you will like it too baby."

¶7 Kailey suggested that they meet up the next day, but Dickerson pleaded, "Awwwww baby y . . . I wanted to Tonite please." Kailey said that she was just nervous, prompting the following exchange:

> Dickerson: Nervous about wat baby
>
> Kailey: if u kiss me and do more

---

1. The agent was able to confirm that the texter was the same person as the "Lavell" on the dating app because Dickerson "identified himself" on the text and because the agent compared the photos Dickerson posted to his dating app profile with those Dickerson sent by text.

Dickerson: About wat

Kailey: ive only kissed like a couple boys

Dickerson: Ok u never had nobody play wit it or lick it

Kailey: never

Dickerson: Has ur friend

Dickerson: U want to try

Kailey: what?

Dickerson: Do ur friend and her boyfriend do that

Kailey: yeah

Dickerson: So wats up u want to

Kailey: what?

Dickerson: Do u want to try

Dickerson: Do u want to try

Kailey: lol. im so lost. try what

Dickerson: Lick it and play wit it

Kailey: i hpe it doesnt hurt

Dickerson: It won't baby I'll be gentle

Kailey: promise

Dickerson: I PROMISE BABY AND Do u play wit ur self some times

Kailey: tried but dont know if im doing it right

Dickerson: Well I'll show u Tonite baby

Dickerson: U Gon send the address baby

Kailey: youll teach me

Dickerson: Yes

Dickerson: U Gon like the way I do it and daddy going to teach u a lot

Dickerson: Baby

Dickerson: U playing

Kailey: im here babe sorry

Dickerson: So wats up baby

Kailey: so if u lick it and playwith it. will i get pregnant?

Dickerson: Hellllllllll nawwwwwwwww baby

Dickerson: Noooooooooooo

Dickerson: NOOOOOOOOOOOOOO u won't

Kailey: u sure

Dickerson: I promise

Dickerson: I promise on my dead grandmother

Kailey: so youll were a condom?

Dickerson: Do u want me to

Kailey: i dont want to get pregnant

Dickerson: And ur asking all these questions like u couldn't also [ask] me this face to face

Dickerson: Baby I promise u can't

Dickerson: I promise on my dead grand mother

Dickerson: U CAN'T GET PREGNANT

Dickerson: I wish u would believe and give me a chance

Kailey: can you bring a condom

Kailey: i know sorry

Kailey: dont be mad please

Dickerson: Yes baby I can if u stop playin

Dickerson: I'm not baby but I'm tryin to show u that u can trust me

Kailey: It's better with a condom

Dickerson: Oooooookkkkkk

Dickerson: So wats up wasting time baby

Dickerson: I'll stop and get one

Kailey: Ok I'll sneak out

Dickerson: Ok

Dickerson: I hope u forreal and not playing

Kailey: How long will u be

Dickerson: I don't wanna to wait forever

Dickerson: I'm waiting on u to send the address

Dickerson: U never sent the address

Dickerson: I been waiting on u

Dickerson: Awwwwwww u playing Kailey

Dickerson: Hellllllllo

Dickerson: Hello

Kailey: Sorry babe

Kailey: I'm getting ready

Kailey: I'm not playing u promise

Kailey: There's a gas station by my house

Dickerson: U haven't sent no address

Dickerson: We're the address

Dickerson: U got me feeling like u playing

¶8      Kailey gave Dickerson the address of a gas station next to an apartment complex and said she would meet him there. The two continued to exchange text messages while Dickerson was en route. Dickerson repeatedly asked Kailey to send him a picture of

herself. When he asked what she was wearing, Kailey replied that she was in a "[p]ink shirt and jeans," leading to the following exchange:

> Dickerson: Ok baby

> Dickerson: Y u didn't put on tights or a dress something easy

> Kailey: It's cold outside babe. Lol

> Dickerson: Lol not really but ok and do u kiss baby

> Kailey: Yeah

> Dickerson: Can I kiss u

> Kailey: I hope so

> Dickerson: Ok I am baby

> Dickerson: Have u ever suck on it before

> Kailey: Suck on what

> Dickerson: Dick baby

> Kailey: Oh never lol

> Dickerson: O ok u watch porn

> Kailey: I've seen it but don't really watch it

> Dickerson: O ok

> Kailey: U still coming?

> Dickerson: U want to learn

Dickerson: Hell yes I'm close

Kailey: Yes

Dickerson: U want to learn baby

Kailey: I do

Dickerson: Ok u mine right

Kailey: Yeah I'm yours

Dickerson: 9 mins away baby

¶9 When Dickerson arrived at the designated meeting place, the agent was "able to confirm [Dickerson's] identity when [he] saw him as the person that [he] had been chatting with." Authorities arrested Dickerson. A search of his car uncovered drug paraphernalia and a "new pack of condoms."

¶10 Dickerson was charged with three sexual offenses—one count of enticing a minor to engage in illegal sexual activity and two counts of attempted sodomy upon a child—and two drug offenses—possession of drug paraphernalia and possession of a controlled substance with intent to distribute. Dickerson subsequently filed a motion to dismiss under Utah Code section 76-2-303(5), alleging that the agent had entrapped him into committing the offenses.

¶11 After a hearing, the district court granted Dickerson's motion as to the sex offenses but denied it as to the drug counts. In its written ruling, the district court explained that although Utah had abandoned a subjective standard of entrapment and adopted an objective standard, "over time subjective reasoning crept back into" Utah's appellate decisions. In particular, the district court believed that it violated the objective test "to consider the impact of police inducement on the particular

defendant." Instead, the court believed it was limited to assessing "the impact of the inducement on a reasonable person under the circumstances of the particular case."

¶12 Applying that standard, the court concluded "that the methods used by the [a]gent in this case created a substantial risk that the charged sex offenses would be committed by someone not otherwise ready to commit them." In reaching that conclusion, the court relied "on the compounding impact of three decisions by the [a]gent—the decision to adult-certify Kailey on [the dating app], the decision to post a picture of an adult woman on Kailey's [dating app] profile, and the decision to first direct the text messaging toward overtly sexual topics." Because the court concluded that Dickerson was entrapped, it dismissed the enticement and sodomy counts. The State appeals the dismissal.

ISSUES AND STANDARDS OF REVIEW

¶13 We address two issues on appeal. First, we consider Dickerson's contention that we lack jurisdiction over this appeal. Whether we have appellate jurisdiction "presents a question of law." *Trapnell & Assocs., LLC v. Legacy Resorts, LLC*, 2020 UT 44, ¶ 29, 469 P.3d 989.

¶14 Because we conclude that we have jurisdiction, we next address the State's argument that the district court erred in concluding, as a matter of law, that Dickerson was entrapped. "An entrapment ruling involves a mixed question of law and fact." *State v. Hatchett*, 2020 UT App 61, ¶ 10, 462 P.3d 1288. "A trial court's findings of fact relating to a claim of entrapment will be reversed on appeal only if clearly erroneous." *State v. Keitz*, 856 P.2d 685, 689 (Utah Ct. App. 1993), *abrogated on other grounds by State v. Montoya*, 887 P.2d 857 (Utah 1994). "On the other hand, the trial court's statutory construction and application of the entrapment statute present questions of law, which we review for correctness." *Id.* Entrapment is established as a matter of law only

when the facts found by the district court are "sure to leave *all* reasonable minds reasonably doubting" whether the defendant freely and voluntarily committed the crime. *State v. Hernandez*, 2020 UT App 58, ¶ 6, 462 P.3d 1283; *see also Hatchett*, 2020 UT App 61, ¶ 10 ("Only when reasonable minds could not differ can we find entrapment as a matter of law." (cleaned up)).

ANALYSIS

I. Jurisdiction

¶15    As an initial matter, we must address whether we have jurisdiction over the State's appeal. After the district court dismissed the enticement and sodomy counts, the State filed both a notice of direct appeal and a petition for interlocutory appeal out of "an abundance of caution." This court issued a sua sponte motion for summary disposition asking the parties to address whether the direct appeal should be dismissed for lack of jurisdiction. In response, the State initially argued that we had jurisdiction over a direct appeal under subsection (5) of the entrapment statute, *see* Utah Code Ann. § 76-2-303(5) (LexisNexis 2017), even though not all charges against Dickerson were dismissed. Dickerson argued that we lacked jurisdiction because the district court's order was not final and appealable.

¶16    We ultimately withdrew the motion for summary disposition, ordering that a ruling on the jurisdictional issue would be deferred pending plenary presentation and consideration of the appeal. We also directed the parties to address in their briefs whether the district court's order was final and appealable. That same day, we consolidated the two appeals and granted the State's petition to file an interlocutory appeal. We did so without first allowing Dickerson to file a response to the State's petition as required by rule 5(f) of the Utah Rules of Appellate Procedure.

¶17 Upon submission of its opening brief, the State conceded that this court lacked jurisdiction over its direct appeal. Dickerson then filed a motion to dismiss the appeal in its entirety, based on the State's concession that we lacked jurisdiction over the direct appeal and based on this court's failure to meet its own procedural requirements before granting the interlocutory appeal. The State responded by arguing that the procedural error in granting the interlocutory appeal without a response did not raise a jurisdictional defect but merely required the court to hold the appeal in abeyance while Dickerson was given time to respond. We denied Dickerson's motion to dismiss and reiterated that Dickerson could raise these issues in his initial brief and that a ruling would be "deferred pending plenary presentation and consideration of the appeal."

¶18 In briefing and at oral argument, Dickerson again argued that the interlocutory appeal had been improperly granted. After oral argument, we issued an order acknowledging "that granting the petition for interlocutory appeal without calling for a response ran afoul of rule 5(f)" of our appellate rules, and we invited Dickerson to file a response to the State's petition for interlocutory appeal within fourteen days. Dickerson filed a timely response.

¶19 Having now carefully reviewed Dickerson's opposition to the petition for interlocutory review, we reaffirm our decision to grant the State's interlocutory appeal. Even if we had timely requested and considered Dickerson's response to the petition, we would have exercised our discretion to grant the interlocutory appeal notwithstanding his arguments in opposition. As a result, our failure to follow the procedure in rule 5(f) did not impact Dickerson's substantial rights. *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). Because we have jurisdiction over the State's interlocutory appeal, we deny

Dickerson's motion to dismiss that appeal and proceed to consider its merits.[2]

## II. Entrapment

### A. Utah's Entrapment Standard

¶20 We begin by addressing the legal standard for entrapment in Utah. When our legislature enacted the Utah criminal code in 1973, it adopted a statutory framework governing the assertion of an entrapment defense. *See State v. Torres*, 2000 UT 100, ¶ 7 n.1, 16 P.3d 1242 (noting that the statute "has not been substantially altered since its enactment in 1973"). A defendant may assert the defense by filing a written motion before trial, identifying the evidentiary foundation for the claim. *See* Utah Code Ann. § 76-2-303(4) (LexisNexis 2017); *see also State v. Hernandez*, 2020 UT App 58, ¶ 6, 462 P.3d 1283. The court then must "hear evidence on the issue and shall determine as a matter of fact and law whether the defendant was entrapped to commit the offense." Utah Code Ann. § 76-2-303(4).

¶21 "Only when reasonable minds could not differ can [the court] find entrapment as a matter of law." *State v. Hatchett*, 2020 UT App 61, ¶ 10, 462 P.3d 1288 (cleaned up). If the court concludes, as a matter of law, "that the defendant was entrapped, it shall dismiss the case with prejudice." Utah Code Ann. § 76-2-303(5). If "reasonable minds could differ on whether or not entrapment occurred," the court must deny the motion and

---

2. Dickerson also suggests that the State's appeal violates his double jeopardy rights. But double jeopardy does not attach until "the jury is impaneled and sworn." *See Martinez v. Illinois*, 572 U.S. 833, 834 (2014) (per curiam) (cleaned up). As a result, pre-trial dismissals do not trigger double jeopardy protections. *See State v. Cahoon*, 2009 UT 9, ¶ 16, 203 P.3d 957.

"allow[] the issue of entrapment to go to the jury." *State v. Beddoes*, 890 P.2d 1, 2 (Utah Ct. App. 1995).

¶22    The statute also codifies the meaning of entrapment under Utah law:

> Entrapment occurs when a peace officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

Utah Code Ann. § 76-2-303(1). By adopting this definition, the legislature rejected the "subjective test" previously applied by Utah courts. *See State v. Taylor*, 599 P.2d 496, 503 (Utah 1979). Under the statute's more objective standard, the test "is whether a law enforcement official or an agent, in order to obtain evidence of the commission of an offense, induced the defendant to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who was merely given the opportunity to commit the offense." *Id.*

¶23    The district court's ruling in this case appears to have been animated by its concern that "over time subjective reasoning crept back into the analysis." As examples, the court cited cases examining whether "the crime was a result of defendant's own voluntary desire and intent to commit the crime," *see State v. Moore*, 782 P.2d 497, 501 (Utah 1989), or whether the defendant "freely and voluntarily committed the offense," *see State v. Udell*, 728 P.2d 131, 132 (Utah 1986). Under the district court's interpretation, courts improperly "drift into subjective reasoning" when they "begin to consider the impact of police inducement on

the particular defendant, rather than the impact on a reasonable person under the defendant's circumstances."

¶24    But neither the entrapment statute nor our case law uses a "reasonable person" standard. We find no support for the proposition that the applicable entrapment standard requires the court to ignore a defendant's demonstrated willingness to commit the crime or to limit its inquiry solely to the impact of the government's conduct on a hypothetical reasonable person in the defendant's circumstances.

¶25    This confusion stems from a reasonable misunderstanding about what is meant by the "objective" and "subjective" standards for entrapment. "The basic difference is that the subjective test looks primarily to a defendant's predisposition to commit the crime, whereas the objective test looks primarily to police conduct." *State v. Salmon*, 612 P.2d 366, 368 n.5 (Utah 1980). In the seminal case interpreting Utah's entrapment statute, our supreme court quoted the following examples with approval to illustrate the difference between the subjective and objective approaches:

> Under the [subjective theory], if A, an informer makes overreaching appeals to compassion and friendship and thus moves D to sell narcotics, D has no defense if he is predisposed to narcotics peddling. Under the [objective theory,] a defense would be established because the police conduct, not D's predisposition, determines the issue. Under the [subjective theory], A's mere offer to purchase narcotics from D may give rise to the defense, provided D is not predisposed to sell. A contrary result is reached under the [objective theory]. A mere offer to buy hardly creates a serious risk of offending by the innocent.

*Taylor*, 599 P.2d at 503 (quoting Model Penal Code § 2.10 (Am. L. Inst., Tentative Draft No. 9, 1959)).

¶26　The subjective test consisted of "two inquiries: (1) whether there was an inducement on the part of the government; and (2) if so, whether the defendant showed any predisposition to commit the offense." *Id.* at 499–500. Because the subjective test turned on the defendant's "general intention or predisposition to commit, whenever the opportunity should arise, crimes of the kind solicited," it allowed the prosecution to admit evidence "to show the defendant's reputation, criminal activities, and prior disposition." *Id.* at 501–02 (cleaned up). That evidence could be properly considered to determine whether the defendant was predisposed to commit the charged crime. If the defendant was so predisposed, entrapment was no defense, regardless of the nature of the inducement.

¶27　The entrapment statute rejects this subjective approach. Indeed, the statute expressly provides, "In any hearing before a judge or jury where the defense of entrapment is an issue, past offenses of the defendant shall not be admitted . . . ." Utah Code Ann. § 76-2-303(6) (LexisNexis 2017). "The effect of this provision is to eliminate the opportunity for the prosecution to present proof of the accused's criminal character or predisposition by evidence of his past offenses." *Taylor*, 599 P.2d at 503.[3] Under the

---

3. We recognize that some Utah entrapment cases have relied on propensity-type evidence, an approach that appears to be "at odds with both the entrapment statute and our Supreme Court's more recent articulation of the objective standard." *State v. Hatchett*, 2020 UT App 61, ¶ 14 n.7, 462 P.3d 1288. For example, in *State v. Udell*, 728 P.2d 131 (Utah 1986), the court cited the fact that the defendant "was a known drug user" and that the officer "had reason to believe that [the] defendant was involved in drug trafficking," both of which seem to bear on whether the defendant

(continued…)

objective standard, "[i]f the police conduct would create a substantial risk that a normal law-abiding person would be induced to commit a crime, entrapment has occurred regardless of the predisposition of the defendant." *State v. Martinez*, 848 P.2d 702, 706 (Utah Ct. App. 1993). This reflects the legislative judgment that "[a]ppeals to sympathy, friendship, the possibility of exorbitant gain, and so forth, can no more be tolerated when directed against a past offender than against the ordinary law-abiding citizen." *Taylor*, 599 P.2d at 502 (quoting *Sherman v. United States*, 356 U.S. 369, 384–85 (1958) (Frankfurter, J., concurring)). The contrary view "would espouse the notion that when dealing with the criminal classes anything goes." *See id.* (cleaned up).

¶28    In short, adoption of the objective standard eliminated any "'predisposition' or 'innocence' requirement to constitute an entrapment defense." *Id.* at 503. "[I]f the police conduct would create a substantial risk that a normal law-abiding person would be induced to commit a crime, entrapment has occurred regardless of the predisposition of the defendant." *State v. LaVesseur*, 854 P.2d 1022, 1025 (Utah Ct. App. 1993) (cleaned up).

---

was predisposed to distribute a controlled substance. *Id.* at 133. And in *State v. Torres*, 2000 UT 100, 16 P.3d 1242, the court appeared to rely on the fact that the defendant "was known in the community as a 'big mover of drugs,'" *id.* ¶ 12, to distinguish that case from one in which there was "no evidence that the defendant had previously possessed or dealt with the drug," *State v. Kourbelas*, 621 P.2d 1238, 1240 (Utah 1980); *see Torres*, 2000 UT 100, ¶ 12. Fortunately, to resolve this case, we are not required to reconcile the apparent conflict between our supreme court's articulation of the objective standard and its references to predisposition evidence in *Udell* and *Torres*. Here, the record contains no predisposition evidence.

¶29 When we refer to the "subjective" or "objective" standards of entrapment in the abstract, we sometimes overlook the key difference between the two approaches—whether the defense is available to one with a criminal history demonstrating a predisposition to commit the crime. Over time, instead of articulating the standard as one focusing *primarily* on police conduct, the standard began to be framed as focusing *solely* on police conduct. *Compare Salmon*, 612 P.2d at 368 n.5 ("The basic difference is that the subjective test looks primarily to a defendant's predisposition to commit the crime, whereas the objective test looks primarily to police conduct."), *with Torres*, 2000 UT 100, ¶ 8 (describing the "objective standard for entrapment cases, which focuses solely on police conduct, rather than on the defendant's predisposition to commit a crime"). And this court once suggested that the objective standard made irrelevant not only the "character of the suspect" and "his predisposition to commit the offense," but also "his subjective intent." *State v. Wright*, 744 P.2d 315, 318 (Utah Ct. App. 1987).

¶30 But as our supreme court has explained, entrapment operates as a defense precisely because the nature of the police conduct gives rise to "a reasonable doubt that the defendant freely and voluntarily committed the offense." *See Torres*, 2000 UT 100, ¶ 8 (cleaned up). If there is "a reasonable basis in the evidence upon which jurors could find beyond a reasonable doubt that the crime was a result of [the] defendant's own voluntary desire and intent to commit the crime," the defendant has not established entrapment as a matter of law. *Moore*, 782 P.2d at 501.

¶31 These seemingly contradictory statements have understandably led to some confusion. *See, e.g.*, *Hernandez*, 2020 UT App 58, ¶ 7 n.2 (noting the apparent contradiction between an objective standard that "focus[es] solely on police conduct" and "the proximate instruction" that entrapment is a defense because it raises a reasonable doubt as to whether "the defendant freely and voluntarily committed the offense" (cleaned up)); *Hatchett*,

2020 UT App 61, ¶ 14 n.7 (same). Here, the district court concluded that "to consider the impact of police inducement on the particular defendant" would violate the objective test. The court believed it was limited to assessing "the impact of the inducement on a reasonable person under the circumstances of the particular case."

¶32   The standard articulated by the district court—that of "a reasonable person under the circumstances of the particular case"—is not based on the statutory language. It is similar to the "individualized objective standard" used when applying the stalking statute. *See Baird v. Baird*, 2014 UT 08, ¶ 26, 322 P.3d 728. But unlike the stalking statute, the entrapment statute does not direct us to assess the effect of the conduct on "a reasonable person in the [person's] circumstances." *Compare* Utah Code Ann. § 76-5-106.5(1)(d) (LexisNexis 2017) *with id.* § 76-2-303. And a "reasonable person" standard has never been applied in our case law interpreting the entrapment statute. The closest articulation of such a standard is the suggestion that "the propriety of government action is measured by its probable effect upon a hypothetical person in the setting in which the inducement took place." *State v. Richardson*, 843 P.2d 517, 520 (Utah Ct. App. 1992) (cleaned up) (quoting *Wright*, 744 P.2d at 318, which is the only other Utah case in which this language is used).

¶33   But ever since *Taylor*, our supreme court has consistently instructed courts to look to all the circumstances surrounding the police conduct, including "'the response to the inducements of the agent,'" in assessing "'what the effect of the governmental agent's conduct would be on a normal person.'" *Id.* at 519 (quoting *Taylor*, 599 P.2d at 503). And both this court and our supreme court have regularly considered the impact of police inducement on the particular defendant. In some cases, we have relied on the defendant's responses as evidence of a reluctance to commit the crime that subsequently had to be overcome by police inducement. *See, e.g., State v. Kaufman*, 734 P.2d 465, 467–68 (Utah

1987) (noting the defendant had declined the undercover officer's offer to sell him stolen jewelry and diamonds but had allowed her to leave it in his safe when the officer, posing as a "relatively young, divorced mother of six children who was having hard times," told him she did not like "carrying the stuff around"); *State v. Kourbelas*, 621 P.2d 1238, 1240 (Utah 1980) (relying on the persistent requests of the undercover agent to purchase drugs from the defendant); *State v. Sprague*, 680 P.2d 404, 406 (Utah 1984) (same). In many others, we have relied on the defendant's responses as evidence of a willingness to commit the crime when merely presented with the opportunity. *See, e.g.*, *Hernandez*, 2020 UT App 58, ¶¶ 11–12 (noting that when the defendant "was approached and offered the opportunity to engage in criminal conduct, he expressed interest without impermissible prompting"); *Torres*, 2000 UT 100, ¶ 14 (stating that the defendant's "persistent, and eventually successful, attempts to get the drugs to the informant, despite considerable difficulty," illustrated "[h]is willingness to commit the crime"); *State v. Byrns*, 911 P.2d 981, 988 (Utah Ct. App. 1995) (explaining that the record was "replete with statements by defendant demonstrating his willingness and eagerness to set up a methamphetamine lab"); *State v. Gallegos*, 849 P.2d 586, 588 (Utah Ct. App. 1993) (noting that the confidential informant asked the defendant to procure him some drugs on one occasion and "the defendant readily responded affirmatively that he would do so").

¶34 Evidence of the defendant's demonstrated willingness or eagerness to commit the crime in question is distinguishable from the type of predisposition evidence that the entrapment statute prohibits. Under the statute's objective standard, the entrapment defense is available to any defendant who can show that the government's methods created a substantial risk of ensnaring one not otherwise ready to commit the offense, regardless of whether the defendant has a history of prior actions indicating a predisposition to commit the crime. Looking at the "impact of police inducement on the particular defendant" is not

incompatible with that standard. The defendant's reactions to the government inducement—for example, whether the defendant hesitates when presented with an illegal opportunity and succumbs only to persistent pressure or, conversely, whether the defendant actively pursues the commission of the crime despite opportunities to withdraw—are highly relevant to the statutory question of whether the police methods created "a substantial risk that the offense would be committed by one not otherwise ready to commit it," or whether those methods "merely afford[ed] a person an opportunity to commit an offense" that the person was "otherwise ready to commit." Utah Code Ann. § 76-2-303(1). Therefore, we examine Dickerson's responses to the government inducement along with all other relevant circumstances.

B.      Application of the Objective Standard

¶35    "In assessing police conduct under the objective standard, the test to determine an unlawful entrapment is whether a law enforcement official or an agent, in order to obtain evidence of the commission of an offense, induced the defendant to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who was merely given the opportunity to commit the offense." *State v. Taylor*, 599 P.2d 496, 503 (Utah 1979). In other words, we ask "whether the government's methods create a substantial risk of inducing the commission of a crime despite a person's lack of initiative or desire to commit it." *State v. Hernandez*, 2020 UT App 58, ¶ 13, 462 P.3d 1283. "Only when reasonable minds could not differ can we find entrapment as a matter of law." *State v. Haltom*, 2005 UT App 348, ¶ 7, 121 P.3d 42. Otherwise, it is "a question properly reserved for the jury." *State v. Gallegos*, 849 P.2d 586, 588 (Utah Ct. App. 1993); *see also id.* at 590.

¶36    Entrapment "is a highly fact-intensive" inquiry. *State v. Torres*, 2000 UT 100, ¶ 8, 16 P.3d 1242. The surrounding circumstances, including "the transactions leading up to the

offense, the interaction between the agent and the defendant, and the response to the inducements of the agent, are all to be considered in judging what the effect of the governmental agent's conduct would be on a normal person." *See Taylor*, 599 P.2d at 503. Unlike the district court, we do not view this language as "a judge-made multi-factored test."[4] Rather, it merely illustrates that the entire course of conduct must be considered in assessing the effect that the government's methods would have on a person not otherwise ready to commit the crime. "Evidence of the setting in which the inducement took place is of course highly relevant in judging its likely effect." *State v. Cripps*, 692 P.2d 747, 750 (Utah 1984) (cleaned up) (quoting *Sherman v. United States*, 356 U.S. 369, 384–85 (1958) (Frankfurter, J., concurring)).

¶37    In the fifty years since the entrapment statute was enacted, our supreme court has held that a defendant was entrapped as a matter of law in only two types of cases. The first type of case involves "improper police conduct" in which the government agent applied "persistent pressure" or "persistently pursued" the defendant to commit the crime. *Torres*, 2000 UT 100, ¶ 9 (citing *State v. Sprague*, 680 P.2d 404, 406 (Utah 1984), and *State v. Kourbelas*, 621 P.2d 1238, 1240 (Utah 1980)). The second type of case involves "appeals based on sympathy, pity, or close personal friendships, or offers of inordinate sums of money." *Id.* (cleaned up) (citing *Taylor*, 599 P.2d at 503, and *State v. Kaufman*, 734 P.2d

---

4. Noting that "the Utah Supreme Court in recent years has embarked on a campaign to dismantle multi-factored tests in favor of applying the language of the rules of evidence," the district court "reject[ed] the amorphous standards articulated in Utah's entrapment case law, and instead applie[d] the plain language of section 76-2-303." This approach is incompatible with principles of vertical stare decisis, which "compels a court to follow strictly the decisions rendered by a higher court." *State v. Benson*, 2014 UT App 92, ¶ 28, 325 P.3d 855 (cleaned up).

465, 468 (Utah 1987)). Neither of those impermissible methods is implicated in this case.

¶38    First, Dickerson was not subjected to persistent requests to engage in criminal conduct. We have previously recognized that "excessive pressure or goading by an undercover officer might constitute entrapment." *State v. J.D.W.*, 910 P.2d 1242, 1244 (Utah Ct. App. 1995). In *Kourbelas*, for example, the undercover agent "first suggested the purchase of marijuana from the defendant," "renewed the contact and the request" two weeks later, and then "followed up by calling the defendant at least five times in attempting to purchase the marijuana." 621 P.2d at 1240. Under those circumstances, our supreme court held that "there necessarily exists a reasonable doubt as to whether the offense committed was the product of the defendant's initiative and desire, or was induced by the persistent requests of [the undercover agent]." *Id.* On the other hand, in *J.D.W.*, this court could not say that a defendant was entrapped as a matter of law where the undercover officer merely offered to sell the defendant marijuana but "did not make repeated requests or badger" the defendant to buy it. *See J.D.W.*, 920 P.2d at 1244.

¶39    Here, the undercover agent did not harass Dickerson into committing the crime. It was Dickerson who asked for Kailey's phone number "so I can text u" after learning she was only thirteen years old. It was Dickerson who sent the first text saying, "Hey baby its me." And whenever Kailey did not immediately respond to a text, Dickerson sent multiple follow-up messages, asking for reassurance that Kailey was "forreal" and not "playing" him. It was Dickerson who proposed that they meet in person—"to smoke and what else can we do baby"—and asked Kailey to send him her address. In fact, Dickerson asked Kailey for her address no less than ten times beginning at 11:51 p.m., until he finally received the address at 12:47 a.m.

¶40   A defendant is not entitled to acquittal as a matter of law under an entrapment theory where he has actively pursued the commission of the crime despite opportunities to withdraw. For example, in *Torres*, despite "several opportunities to back out of [a] drug deal," the defendant's "willingness to commit the crime [was] illustrated by his persistent, and eventually successful, attempts to get the drugs to the informant, despite considerable difficulty." 2000 UT 100, ¶ 14; *see also Hernandez*, 2020 UT App 58, ¶¶ 11–12 (noting that the defendant had "an opportunity to desist" from solicitation of a prostitute when the undercover detective rejected "his initial low-ball offer," but persisted in making "a realistic offer of payment to the detective to engage in a sex act"). A defendant's "independent and persistent attempts" to commit the crime demonstrate that "his actions were freely and voluntarily committed, and thus were not induced by [government] conduct." *See Torres*, 2000 UT 100, ¶ 14 (cleaned up).

¶41   Over the course of the three-and-a-half-hour conversation, the agent gave Dickerson multiple opportunities to back out. When Kailey expressed reluctance, Dickerson assured her that he would be gentle, that she would like it, and that she would not get pregnant. He expressed frustration that "ur asking all these questions like u couldn't also [ask] me this face to face." When she continued to hesitate, he begged her to stop "playin" and "wasting time" and to send him her address. Kailey even suggested that they meet up the next day, but Dickerson pleaded, "Awwwww baby y . . . I wanted to Tonite please." Numerous times, the agent "offered [Dickerson] an opportunity to desist," yet Dickerson persisted in soliciting sex from a thirteen-year-old girl "when provided with the mere opportunity to do so." *See Hernandez*, 2020 UT App 58, ¶¶ 11–12.

¶42   In fact, Dickerson's response to the police inducement was remarkably like that of the defendant in *State v. Hatchett*, 2020 UT App 61, 462 P.3d 1288, a case in which this court affirmed the district court's denial of a pre-trial motion to dismiss based on

entrapment. In *Hatchett*, the defendant placed an ad looking for an "18–25 year old guy to party and play with"—a reference to drug-enhanced sexual activity. *Id.* ¶ 2. An undercover agent, posing as "Cade," responded with the message, "saw ur post how yung is 2 yung." *Id.* ¶ 3. When Hatchett asked his age, Cade responded, "old enuff 2 no what I want, middle school but lik coke." *Id.* Hatchett then asked if Cade had "a connect" (presumably to obtain cocaine), what his "stats" were, and what he was "into." *Id.* Cade responded, "almost 14 m whatever." *Id.* Nonetheless, Hatchett continued to communicate with Cade for several weeks, making plans to meet up when Hatchett was in town. *Id.* "Whenever Hatchett asked Cade what he wanted to do when they met up, Cade would respond evasively by stating that he did not know" and "never proposed specific sex acts." *Id.* ¶ 4. But "it became readily apparent that Hatchett was undeterred by the fact that Cade was 'almost 14' years old," and "repeatedly steered their conversation in a sexual direction." *Id.* Under these facts, the district court denied the motion to dismiss, concluding that "at most, [the agent] afforded the mere opportunity to commit the offense." *Id.* ¶ 8.

¶43    In affirming that ruling on appeal, this court emphasized that the agent posing as Cade "did not persistently request that Hatchett commit an illegal offense." *Id.* ¶ 16. Unlike in *Kourbelas*, where the agent reinitiated contact with the defendant several times, *see* 621 P.2d at 1240, "Hatchett was subjected to no such persistent effort," *Hatchett*, 2020 UT App 61, ¶ 16. "To the contrary, Hatchett aggressively pursued Cade after he was made aware of Cade's young age." *Id.* This court concluded that "this case does not present a set of circumstances under which we can hold that reasonable minds cannot differ as to whether entrapment occurred." *Id.* ¶ 19 (cleaned up).

¶44    Like the defendant in *Hatchett*, Dickerson aggressively pursued Kailey, not the other way around. And he did so despite knowing her age and having multiple opportunities to change

course. Therefore, the facts do not present a case of "excessive pressure or goading" that would compel the conclusion that Dickerson was entrapped as a matter of law. *See J.D.W.*, 910 P.2d at 1244.

¶45    Second, this case does not involve the kind of "personalized high-pressure tactics or appeals to extreme vulnerability" that might constitute entrapment as a matter of law. *See State v. Martin*, 713 P.2d 60, 62 (Utah 1986). "Extreme pleas of desperate illness or appeals based primarily on sympathy, pity, or close personal friendship, or offers of inordinate sums of money, are examples, depending on an evaluation of the circumstances in each case, of what might constitute prohibited police conduct." *Taylor*, 599 P.2d at 503. For example, in *Taylor*, our supreme court held that the defendant was entrapped as a matter of law when a police informant pleaded with the defendant, with whom she had an intimate relationship, to help her locate drugs to avoid "the agonies of withdrawal" that the defendant, as a recovering addict, had personally experienced. *Id.* at 503–04. And in *Kaufman*, the undercover agent posed as a "divorced mother of six children who was having hard times" and "first became a friend to the defendant so that it was hard for the defendant to call the police and turn her in" when she admitted that the jewelry she had sold him was stolen property. 734 P.2d at 468 (cleaned up).

¶46    Here, the undercover agent did not develop a personal relationship with Dickerson that he then exploited. *See State v. Martinez*, 848 P.2d, 702, 707 (Utah Ct. App. 1993) (concluding that entrapment "require[s] some exploitation of the personal relationship"). He made no appeals to Dickerson's sympathy or pity. Nor did he make any offer that a person not otherwise ready to commit the crime would be hard-pressed to refuse. Indeed, the agent did nothing to "induce" Dickerson's participation beyond posing as a thirteen-year-old girl who was willing to meet him. And instead of actively persuading or convincing Dickerson to

commit the crime, Kailey was hesitant and noncommittal. It was Dickerson who pled with Kailey to meet him that night. He did so "without being badgered, pressured, coerced by pleas of sympathy or a personal relationship, or tempted with an inordinate monetary incentive." *See Hernandez*, 2020 UT App 58, ¶ 12. "As stated in *Taylor*, the objective test does not prohibit the police from affording a person an opportunity to commit crime; it only prohibits active inducements on the part of the government for the purpose of luring an 'average' person into the commission of an offense." *State v. Salmon*, 612 P.2d 366, 368 (Utah 1980).

¶47 The agent in this case did not "employ inducements that would have been, as a matter of law, sufficient to induce an ordinary person," not otherwise inclined, to solicit sex from a thirteen-year-old. *See State v. Gallegos*, 849 P.2d 586, 590 (Utah Ct. App. 1993); *see also Hernandez*, 2020 UT App 58, ¶ 13 ("We do not think a person, not otherwise inclined, would be swayed to patronize a prostitute by the methods employed in this case."). "When there is a reasonable basis in the evidence upon which jurors could believe beyond a reasonable doubt that the crime was a result of a defendant's own voluntary desire and intent to commit the crime, the fact that a police officer merely afforded him the opportunity to commit it, does not amount to entrapment." *Salmon*, 612 P.2d at 369. Because the facts of this case are "not sure to leave all reasonable minds with a reasonable doubt as to whether [Dickerson] acted on his own inclination," the motion to dismiss should have been denied and the entrapment defense presented to the jury. *See Hernandez*, 2020 UT App 58, ¶ 14.

C. The District Court's Ruling

¶48 The district court based its contrary ruling on two principal factors. It found (1) that "a reasonable person could conclude that he was chatting with an adult woman who was only pretending to be a child" because the undercover agent chose to "adult-certify

Kailey" on the dating app and "post the picture of an adult woman" on Kailey's profile, and (2) that the agent "was the one who directed the conversation to overtly sexual topics." Neither of these factors establishes entrapment as a matter of law.

¶49 First, the district court placed great weight on the techniques the agent used to gain access to the dating app. Specifically, the court found it significant that the agent "certified that his online persona was 18 years of age or older" and "posted the picture of an adult woman on the profile," which the court found "appear[ed] to be at least 18 years of age, if not older." The court found these actions to be significant because a reasonable person in Dickerson's circumstances "could justifiably conclude that he [was] chatting not with a child but with an adult woman who was pretending to be a minor and a sexual innocent."

¶50 We see multiple problems with this analysis. For starters, the entrapment defense presupposes that the defendant has committed the crime charged but was entrapped into doing so.[5] If a jury finds that Dickerson believed that Kailey was "an adult woman who was pretending to be a minor and a sexual innocent,"

---

5. Dickerson says that this "is manifestly not true" because the entrapment statute expressly makes the defense "available even though the actor denies the commission of the conduct charged to constitute the offense." *See* Utah Code Ann. § 76-2-303(3) (LexisNexis 2017). But the availability of a defense says nothing about whether the defenses are ultimately inconsistent. *See State v. Mitcheson*, 560 P.2d 1120, 1122 (Utah 1977) (observing that a defendant has "the benefit of every defense" that may raise a reasonable doubt as to his guilt, and "this is true whether his defenses are consistent or not"). A defendant may certainly maintain that he did not commit the offense, but that, if he did, he was entrapped. A jury finding that the defendant did not commit the offense would simply obviate the need to reach the entrapment defense.

Dickerson would be entitled to acquittal, not because he was entrapped, but because he did not act with the requisite mental state and is therefore factually innocent of the charged crimes. *See State v. Hatchett*, 2020 UT App 61, ¶ 9, 462 P.3d 1288 (noting that, in returning a guilty verdict, the jury necessarily rejected both the defendant's entrapment defense and his claim that he believed the undercover persona "was an adult pretending to be a minor for 'fantasy' purposes"). And a reasonable jury could easily draw the opposite inference—that Dickerson believed Kailey was a minor who had falsely certified her age and posted an adult's photograph to circumvent the dating app's "adults only" policy. At best, this evidence "is subject to multiple interpretations." *See State v. Haltom*, 2005 UT App 348, ¶ 12, 121 P.3d 42.

¶51 Additionally, the fact that the agent initially presented the undercover persona as an adult does not establish entrapment as a matter of law. The undercover agent revealed that Kailey was a minor at the outset of the conversation before any discussion of criminal activity occurred. When Kailey told Dickerson she "was in middle school," Dickerson asked, "so how old r u baby." Kailey said she was thirteen. When Dickerson questioned "y it say 18 baby," Kailey replied, "I'm serious. I'm 13." A jury could find that "a person not otherwise ready to commit the crime" would have immediately terminated the conversation. Instead, he asked her why she was on the dating app, if she smoked or drank, and whether she could "get out of the house." And, after learning that he was chatting with a thirteen-year-old on a dating site, Dickerson asked Kailey for her phone number to continue the conversation by text. These facts are not "sure to leave *all* reasonable minds reasonably doubting whether the commission of the offense was the product of [Dickerson's] inclination." *See State v. Hernandez*, 2020 UT App 58, ¶ 6, 462 P.3d 1283.

¶52 Second, the court also found it significant that the undercover agent first "directed the conversation to overtly sexual topics" when Kailey said she was "kinda scared" because

she had "never been with a oldr guy." As an initial matter, we agree with the State that this factual finding is not supported by the evidence. Dickerson was the first to use the phrase "been with" as sexual innuendo when he asked Kailey, "U ever been with a black dude." The district court dismissed the significance of this statement in a footnote, reasoning that, "[t]aken in the context of the brief [dating app] messaging, this question was not overtly sexual." We fail to see how Kailey's use of the phrase could be characterized as "direct[ing] the conversation to overtly sexual topics" while Dickerson's use of the same phrase was "not overtly sexual." Moreover, the first explicit reference to a sexual act came from Dickerson when he asked Kailey, "Ok u never had nobody play wit it or lick it"? And he then promised that he would be gentle, that she would "like the way I do it and daddy going to teach you a lot." Later, Dickerson was the first to explicitly reference a second sexual act when he asked Kailey, "Have u ever suck on it before . . . Dick baby"? Unquestionably, it was Dickerson who first explicitly proposed specific sexual acts. *Cf. Hatchett*, 2020 UT App 61, ¶ 8.

¶53   More importantly, even if the undercover agent had initiated the discussion of sexual activity, merely proposing criminal activity is not improper inducement. In *Hernandez*, for example, an undercover officer approached the defendant's car and asked him if he was "'looking for a date'—lingo used to offer prostitution services." 2020 UT App 58, ¶ 2. When Hernandez responded in the affirmative, the detective asked if he had any money and "then inquired whether Hernandez wanted 'to fuck' or if he just 'wanted a blowjob.'" *Id.* Hernandez responded that he "wanted to go all out," and the two negotiated a price. *Id.* The detective directed Hernandez to meet her around the corner, where he was apprehended by law enforcement. *Id.*

¶54   The district court granted Hernandez's motion to dismiss, "concluding as a matter of law that Hernandez was entrapped to commit the offense of patronizing a prostitute." *Id.* ¶ 14. We

reversed because a factfinder could have reasonably concluded, on the facts presented, that Hernandez was not entrapped. *Id.* ¶ 5. We compared the case to *State v. J.D.W.*, 910 P.2d 1242 (Utah Ct. App. 1995), in which an undercover officer randomly approached two teens at a shopping mall and asked if they wanted to buy marijuana. *Hernandez*, 2020 UT App 58, ¶ 12. In both cases, "the officer merely provided the opportunity" to commit the crime. *Id.* ¶ 9; *J.D.W.*, 910 P.2d at 1244. The fact that the officer "initiated contact and started the discussion about engaging in illegal activity" did not establish entrapment as a matter of law. *Hernandez*, 2020 UT App 58, ¶ 12.

¶55 Similarly, in this case, even accepting the district court's factual finding that it was the agent "who directed the conversation to overtly sexual topics," Dickerson was not entitled to acquittal as a matter of law. "In every case of this type, the intention that the particular crime be committed originates with the police, and without their inducement, the crime would not have occurred. Yet it is perfectly clear that where the police merely furnish an opportunity for the commission of the crime, this is insufficient for the defendant to escape conviction." *State v. Taylor*, 599 P.2d 496, 501 (Utah 1979).

¶56 The statutory question is whether the agent in this case used "methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it." Utah Code Ann. § 76-2-303(1) (LexisNexis 2017). Under these facts, we have no trouble concluding that a reasonable jury could answer that question with a resounding no. At minimum, reasonable minds could disagree as to whether the police methods in this case created a substantial risk that a person not otherwise ready to entice a thirteen-year-old girl to engage in unlawful sex acts would commit the offense. Only when "reasonable minds cannot differ . . . can we hold that entrapment occurred as a matter of law." *State v. Beddoes*, 890 P.2d 1, 3 (Utah Ct. App. 1995).

¶57    The factors identified by the district court—the initial use of an adult profile and photograph and "the decision to first direct the text messaging toward overtly sexual topics"—do not compel a conclusion that Dickerson was entrapped. "Rather than an issue that could be settled as a matter of law, [Dickerson] presented the trial court with evidence that could have supported [his] entrapment defense, but that also could have been interpreted as insignificant." *See Haltom*, 2005 UT App 348, ¶ 12. "[B]ecause reasonable minds easily could differ on the question of entrapment as a matter of law in this case," *see id.*, Dickerson's motion should have been denied and his defense submitted to the jury.

CONCLUSION

¶58    We reverse the district court's dismissal of the enticement of a minor and attempted sodomy on a child charges and remand for trial or other proceedings consistent with this opinion.

———————