2026 UT App 60

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARK ALMA SLATER,
Appellant.

Opinion
No. 20221006-CA
Filed April 16, 2026

Second District Court, Farmington Department
The Honorable Michael D. DiReda
No. 201701757

Scott L Wiggins, Attorney for Appellant

Derek E. Brown and Hwa Sung Doucette,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

MORTENSEN, Judge:

¶1　Mark Alma Slater was convicted of enticing a minor after he attempted to meet up with a police decoy posing as a thirteen-year-old girl. He now argues that his trial counsel (Counsel) provided constitutionally ineffective assistance by withdrawing a requested jury instruction regarding the affirmative defense of entrapment. Because Counsel's decision to abandon the entrapment defense was an objectively reasonable strategic choice, we affirm the conviction.

BACKGROUND

¶2    An officer with an Internet Crimes Against Children task force created an online decoy profile on Whisper, which is an internet "application for people to meet and have sex." The officer used a photograph of a female co-worker who was twenty-four years old for the decoy. The decoy's profile picture showed her partially covered face with a superimposed message on her photograph that said, "Looking for fun!"

¶3    Slater responded to the decoy with the messages "Me too" and "Go down on you? Meet at park? Help me javkoff in car? What fun you want?"[1] The decoy then introduced herself as "Jenny" and stated that she was only thirteen years old. Slater responded to her age revelation with "Lol" and "Fuck." Over the next couple hours, the two continued to exchange messages. Slater repeatedly demanded Jenny send him photographs to prove her identity. Slater also repeatedly asked Jenny explicit questions about her sexual history and what she would like him to do to her and how he could "pleasure" her. He also suggested that they could meet and "touch each other." Specifically, Slater suggested that he could give her an orgasm by oral and digital stimulation and that he could "direct [her] to make [him] orgasm."

¶4    Slater made arrangements to meet Jenny so that she could give him a "hand job." Slater drove to Jenny's location and sent her a message instructing her to "[s]tep outside." A female member of the taskforce poked her head out from around the corner of an apartment building. Slater messaged Jenny that she "look[ed] old." Nevertheless, Slater continued to drive toward the taskforce member. Other members of the task force then pulled Slater over and arrested him. Slater was charged with one count of enticing a minor.

---

1. We have retained Slater's spelling here.

¶5    About a week before trial, Counsel filed a motion to dismiss based on entrapment or, in the alternative, to give an entrapment instruction to the jury. The court decided it would hear arguments on the motion after the State presented its evidence.

¶6    At trial, the State presented the testimony of the officer, who detailed his communications with Slater as recounted above. Notably, the officer testified that he intentionally steered the communication in a way to defend against accusations of entrapment. Specifically, such safeguards included discussing the age of the decoy "early in the conversation . . . so the suspect has an opportunity to leave the conversation and not commit a crime." The officer testified that he allows "the suspect to initiate" topics "such as talking about sex or meeting up for sex" so that the police are not "accused of entrapment or enticing [the suspect] to commit a crime." In addition, the officer testified that he was trained to "give as many outs as possible" so that a suspect can "leave the conversation and not commit the crime." Relevant to Slater's case, the officer testified that he included many such "outs." On cross-examination, Counsel made a point of asking the officer if Slater believed that Jenny was really thirteen. The officer admitted that Slater appeared to be "unsure." Counsel even asked the officer to offer a legal opinion on this issue: "If he didn't believe that he was talking to a 13-year-old, would any of his conduct been a crime?" The officer opined, "According to these chats, this is still a crime. . . . Due to the elements of the crime, all that's necessary is for him to communicate with an individual online who poses as—or who identifies as a 13-year-old."

¶7    The State rested its case after the officer's testimony, at which point the court turned to consider Slater's entrapment motion. Counsel withdrew the motion for dismissal because he didn't believe the evidence was sufficient to establish entrapment as a matter of law, but he asserted there was "still a question as to whether or not [Slater would] be eligible to have a jury

instruction" on entrapment. The court questioned whether an entrapment instruction would even be possible, noting that Slater's defense—apparently obvious from Counsel's cross-examination of the officer—seemed to be that he "believed all along that this was an undercover sting operation of some sort." Given this circumstance, the court was skeptical that an entrapment instruction could "even be given because factually, [it was] no longer an entrapment case" but "a question of mens rea." The court continued, "It's a question of whether he even intended to commit the crime if he never believed that the individual he was communicating with was a minor. . . . I don't think that you can advance the argument that he believed all along it was an undercover officer, but then offer an entrapment instruction. I think the entrapment instruction only works if he believed the person he was talking to was a 13-year-old." Counsel agreed with the court that an entrapment instruction would be appropriate only if Slater, in fact, believed the person he was talking to was a minor.

¶8 Slater elected to testify in his own defense. He stated that he did not believe Jenny was a thirteen-year-old female. He claimed that he had twice reported her profile earlier in the day as being suspicious, which should have led to its removal from the platform if she really was a minor. Instead, he thought Jenny's profile was created by "law enforcement" or "one of those parent—or what are they called—predator groups." Slater admitted he had sent all the messages in the Whisper chat that the State had offered into evidence. But he asserted that he kept asking for details and pictures from Jenny because he wanted to know how law enforcement was "portraying this fake [thirteen-year-old] female." He testified that after he saw the female taskforce member poke her head out from around the corner, his suspicions were "validated" and he intended to drive away, but he was pulled over by police before he could do so. On cross-examination, Slater admitted (1) that he initiated the sexually explicit conversation, (2) that he suggested meeting Jenny, (3) that

the officer did not pressure him to talk about sex, (4) that the officer did not pressure him to meet, "goad" him, "badger" him, or "make repeated requests for any kind of activity," and (5) that the officer did not "rely on any sympathy," "talk . . . about personal friendship," or make an "offer [of] money." Slater also conceded that it was "fair to say" that he was the one "driving the bus" in the conversation and that he "could have quit that conversation at any point." In fact, he agreed that there were "maybe a half dozen or more places where the officer" gave him an "out."

¶9     Following this cross-examination, Counsel withdrew the request for an entrapment instruction, stating that Slater's testimony on "cross-examination [had] answered any of the questions" regarding entrapment. In closing argument, Counsel asserted that Slater "never believed that [Jenny] was a child," "knew that it was law enforcement," and was merely "curious" about the sting operation and how it was conducted. Accordingly, Counsel argued that the State had failed to prove an element of the crime because the evidence showed that Slater believed he was messaging an adult. The jury convicted Slater as charged.

## ISSUE AND STANDARD OF REVIEW

¶10     Slater argues that he received constitutionally ineffective assistance when Counsel withdrew the request for a jury instruction on entrapment. A claim of ineffective assistance raised for the first time on appeal presents a question of law that we decide in the first instance. *State v. Chase*, 2025 UT App 158, ¶ 31, 580 P.3d 421, *cert. denied*, 581 P.3d 560 (Utah 2025).

## ANALYSIS

¶11     Slater argues that Counsel was constitutionally ineffective for not pursuing an entrapment instruction. To prevail on a claim

of ineffective assistance of counsel, a defendant must satisfy the two-part test established in *Strickland v. Washington*, demonstrating both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. 466 U.S. 668, 687 (1984). Because we resolve this appeal on the first *Strickland* prong, we need not analyze prejudice. *See, e.g., State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 ("A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." (cleaned up)).

¶12   Establishing deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* This means that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Moreover, deficient performance is not determined in a vacuum; rather, it involves asking whether the strategy counsel employed was that of a reasonable, competent lawyer in the real-time context of the proceeding." *State v. Rosen*, 2021 UT App 32, ¶ 9, 484 P.3d 1225 (cleaned up).

¶13   Counsel's decision to abandon the entrapment defense was an objectively reasonable, tactical calculation driven by two compelling and related factors. First, Slater's own testimony established the absence of the legal elements of entrapment. Second, there was an inherent contradiction between an entrapment defense and Slater's factual innocence defense.

¶14   First, an objectively reasonable attorney would have concluded that Slater's sworn testimony entirely disproved entrapment. In other words, Slater all but stated he wasn't entrapped, so there was no basis to advance entrapment as a defense in a jury instruction. Under Utah law, "[e]ntrapment occurs when a peace officer . . . induces the commission of an

offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." Utah Code § 76-2-303(1). Utah courts have consistently held that entrapment is limited to two types of cases. "The first type of case involves improper police conduct in which the government agent applied persistent pressure or persistently pursued the defendant to commit the crime. The second type of case involves appeals based on sympathy, pity, or close personal friendships, or offers of inordinate sums of money." *State v. Dickerson*, 2022 UT App 56, ¶ 37, 511 P.3d 1191 (cleaned up).

¶15    During his cross-examination, Slater explicitly denied experiencing either type of tactic. He testified that the officer did not pressure him, goad him, badger him, appeal to his sympathies, or offer him money. Moreover, Slater admitted he directed the conversation, had numerous opportunities or "outs" to leave the chat, and initiated both the sexual discussions and the meeting with Jenny. Because Slater's own testimony thoroughly refuted the presence of any factors necessary to establish entrapment, it provided an unassailable basis for Counsel to withdraw the requested instruction.

¶16    Second, Counsel reasonably decided to abandon the entrapment defense to focus instead on a more viable defense. At trial, Slater maintained that he never believed Jenny was a child, thereby attacking the mens rea element of the enticement charge. Instead of entrapment, Slater advanced a defense that he engaged in some type of covert operation to prove to himself that Jenny was actually an alias created by law enforcement or a to-catch-a-predator group and that he participated in the conversation out of curiosity. If the jury believed this defense, Slater would have been acquitted based on a lack of the requisite mental state. In contrast, an entrapment defense would have presupposed that Slater

actually committed the charged crime—which includes possessing the necessary criminal intent—but was improperly induced into doing so by police. To simultaneously advance both theories, Counsel would have had to argue that Slater knew he was communicating with an adult *and* being entrapped to solicit sexual acts from someone he believed was a minor. "A defense attorney's wide latitude to make tactical decisions surely includes the ability to protect the integrity of his preferred theory of the case by not simultaneously advancing a contradictory one." *State v. Draper*, 2024 UT App 152, ¶ 88, 560 P.3d 122 (cleaned up); *see also State v. Pascual*, 804 P.2d 553, 556 (Utah Ct. App. 1991) ("We believe any election between inconsistent defenses was a legitimate exercise of trial strategy rather than ineffective assistance of counsel."). Put another way, Counsel was under no obligation to push for an entrapment instruction when doing so would have undermined Slater's insistence that he knew full well that Jenny was not a child. Moreover, insisting on the entrapment instruction was likely to have significantly compromised any credibility that Slater otherwise would have had with the jury. As it stood with the mens rea approach, there was at least some hope of acquittal.

¶17 Given that Counsel reasonably recognized that Slater's testimony had precluded the entrapment argument, he did not perform deficiently by making the strategic decision to abandon the entrapment instruction in favor of focusing on the theory that Slater lacked the necessary mental state to commit the crime.

CONCLUSION

¶18 Slater's testimony gave Counsel every reason to abandon the entrapment instruction and embrace the mens rea defense. Thus, Counsel did not perform deficiently, and Slater's ineffective assistance claim fails.

¶19 Affirmed.

———————