2026 UT App 96

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES CHRISTIAN KENT,
Appellant.

Opinion
No. 20230563-CA
Filed June 25, 2026

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 201902922

Andrea J. Garland, Attorney for Appellant

Derek E. Brown and Hwa Sung Doucette,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     James Christian Kent was convicted of enticing a minor after he tried to meet up—ostensibly for sex—with a person he'd been texting on a dating app. The person had told Kent that she was a thirteen-year-old girl, but the person turned out to be an undercover police officer. Kent now appeals his conviction, asserting that (1) there was insufficient evidence to support his conviction, (2) the trial court erred in denying his motion to dismiss on the basis of entrapment, (3) his trial attorney rendered constitutionally ineffective assistance, and (4) the court erred in excluding evidence regarding "catfishing." For the reasons discussed, we reject Kent's arguments and affirm his conviction.

BACKGROUND[1]

*The Interactions Between Kent and Jen*

¶2      An undercover police officer (Sergeant) created a profile for a persona named "Jen" on an online dating app. On the profile, Sergeant listed Jen's age as "19" and attached photos of an adult woman who was "over 18" years old. Sergeant also used another photo of the same woman later, when he responded to Kent's request for a picture of Jen.

¶3      Kent—a man in his fifties—sent Jen a message on the app. Jen responded, and the two of them had a text-message conversation that continued for about a week. At first, they talked about what they were looking for on the app. Kent told Jen that he was looking for "[s]ome one to chill with and have some good times not really looking for stings and shit," and said he was "down for whatever."[2] He then asked her, "You look way young are you really 19[?]" Jen didn't respond to this question and instead said, "Stings and shit? What's that[?]" Kent responded, "You know the shit that comes from boyfriend girlfriend shit, drama I mean is like to be open and honest you know no expectionns." "Well I ain't looking for a bf," Jen said back, to which Kent replied, "Just everything else lol."

¶4      After these first few messages, Kent inquired again about Jen's age. She told him that she was "really only 13 but almost 14

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. In so doing, we present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Repsher*, 2025 UT App 50, n.1, 568 P.3d 1095 (cleaned up).

2. In reciting Kent and Jen's texts, we generally retain the original spelling and grammar.

and . . . mature" and that she was "lookin to hook up with a cool older guy." Instead of stopping the conversation at that point, Kent responded, "Dam that sucks I got a daughter your age[.] As older guy like how old and what are you looking to do with him if you find him[?]" Jen then said, "I guess it just depends on if he is cool," and she noted that "his age doesn't matter." A few minutes later, Kent asked Jen, "Where is your mom and dad and what would they think about all that[?]" Then he asked if Jen had any siblings, and Jen told him she lived with her mom and that her mom worked. Kent then asked Jen if she was "home alone all night" and if she went to school during the day. Jen replied, "Yes I'm in middle school." Kent later told Jen that he "like[d] younger chicks" but that he had "been scammed many times" before, and he asked Jen to participate in a video call with him. In response, Jen said she "[didn't] have face time" and she couldn't join a video call because her "phone is just old and it sucks."

¶5    The text conversation between Kent and Jen then began to turn more explicitly sexual. It proceeded as follows:

Kent:  You've been on [the dating app] for a minute, how many guys have [you] been with off there

Jen:   Only one

Kent:  how old was he

Jen:   28 he said

Kent:  You slept with him

Kent:  ??

Kent:  Kinda personal?

Jen:   I gave him oral. Sorry is that bad

> Kent: Why you telling me sorry I guess if that's what you wanted to do I was only asking to find out your integrity and see where your head is on that have you slept with anyone im wondering?
>
> Jen: Ok I was just bein honest I guess. I won't tell u more if don't want
>
> Kent: That's what I wanted you to do that's cool so have you
>
> Jen: What do you mean
>
> Kent: Are you still a virgin
>
> Kent: 😇
>
> Jen: No I had sex with my old bf last year

Kent also asked whether she thought it was "common for kids [her] age to be having sex," explaining that he was "kinda concerned about how much [his] daughter has gotten into it with her bf." Jen told Kent that he should "maybe be concerned," and then she asked Kent whether he was "a little bit interested" in her.

¶6     Kent didn't immediately respond to that query. But the next day, he asked Jen why she appeared to be interested in him, and Jen responded, "Ok if you don't want me to be I won't. Sorry." Kent then changed the subject, asking if Jen was in school at that moment. After telling Kent that she was in school right then, Jen asked Kent to explain "really what [he was] hoping for with" the two of them. Kent expressed doubt that "somebody like [Jen] would be interested in someone like" him and said, "If . . . you're seriously not trying to get me caught up with the law then i kind of wanna know what is going on in your head and why and maybe I can prevent my daughter from doing the same shit you

know." Jen replied that she wasn't "a cop" and that she was "honestly . . . hoping for something physical," but she reassured Kent that it was "cool" if he didn't "want that."

¶7 Two days later, Kent asked Jen if she had "any way to get around," and he offered to pay her to come over and clean his house. Jen didn't respond until the next day, at which point she told Kent that she was "not wanting to clean." Kent replied, "I'm thinking if you were to give it a try you might end up pretty happy." Jen said that sounded more interesting and to "tell [her] more," and Kent told her that she'd have to come over so he "[could] show [her] what [he needed] done" and so they could discuss "what [he would] pay" for those services. But no meeting happened because Kent decided they wouldn't have enough time. He told Jen, "[W]e are going to need allot more time than that i promise especially if it's going to be any kind of fun you know what I mean[?]" He also told Jen that he "really wanted to see [her]" that night but that "good things come to those who wait."

¶8 In the meantime, the two shared photos of themselves not on their profiles. After receiving a photo, Kent responded, "Hell Yea" and "Your awesome and hella sexy." After he sent a photo of his own, he told Jen to delete it as well as their text messages.

¶9 The next day, Kent disclosed to Jen that his mother had "stage 4 lung cancer." He explained that his mother had always helped out with his children and that he needed "to find anybody [who] want[ed] to help [him]." In this context, he said, "I'm kind of scared can't afford to have anything happen to me you know . . . my kids need me my mom needs me." Jen asked how she could help, and Kent asked her to "promise [him] [she wasn't] a cop or working with the cops," which she did. Then Kent asked her when he could pick her up at a transit station for a meeting.

¶10 Jen wanted to know what they were going to do once she got there, and Kent responded evasively. He said, "Honestly I'm not going to talk about what we're going to do on the phone but

. . . whatever you want to do have fun for real." Jen replied, "K I ain't tryna get in trouble I just was hopin we could maybe hookup and have that kinda fun but if that's not what you wanna do just say you don't." Kent then responded with this message:

Babe i wanna be  In your

To this, Jen clarified, "So in my what[?]" Kent replied, "I'm not saying s*** on this stupid ass communication device you know what I mean I'm sure you're smart enough girl you figure it out . . . ." Jen said she was only asking because she was "nervous." Kent then texted, "[I]t's all good I know what you want." He explained that what they were going to do was "really dumb" but that he was "down to give [Jen] whatever [she] want[ed]."

¶11 During their week-long back-and-forth, Jen and Kent also talked over the phone on three separate occasions, with a female detective (Detective) voicing Jen. Detective later explained that she was "trying to mimic a 13-year-old female" and "was implying that [she] was suggesting something sexual" in order to "figure out what [Kent's] intent was with" Jen. The first call didn't last very long because Jen said she was still in school, and Kent told her to call him back later. In the second call, Kent told Jen to "call [him] right back," and the call only lasted about thirty seconds. In the third call, Kent explained to Jen that he had needed her to call back before because her "phone [had been] echoing bad" and "sound[ed] like somebody's got . . . another line on it." On the call, Kent suggested to Jen that they should "kick it" and "talk." And when Jen said she thought that would be "boring," Kent replied, "I'm hardly ever boring." Later in the call, he acknowledged that he was "[k]ind of scared" of "going to jail" because he "st[ood] to lose everything." But as the call ended, they still decided they would meet up sometime later.

¶12    In one of their final texts, when Kent thought Jen was on her way over to see him, Jen asked Kent how he was going to "make sure" she didn't "get pregnant." He told her he had "that covered." A few minutes later, when Kent arrived at the meeting location, officers detained him. In a subsequent search of Kent's vehicle, they found no condoms or sex toys.

*The Interview with Police*

¶13    After Kent was detained, he was interviewed by Sergeant and another officer (Officer). At the start of the interview, Officer told Kent that they needed to talk to him because "a mom called . . . very concerned about . . . a text message conversation between . . . her daughter and an adult male." Kent said he understood because he also had a thirteen-year-old daughter. When discussing Jen, Kent admitted that Jen had told him that "she was under 18." When Officer pressed him further, Kent answered that he believed Jen to be "[a]lmost the same age as [his] daughter"— "13, almost 14" years old. Kent explained that he had been talking to Jen because he was "concerned" and "curious," and because he "wanted to . . . be friends with her and . . . needed some help in [his] house for cleaning . . . because [his] mom's got cancer."

¶14    Officer also asked Kent about why he was concerned about Jen's police involvement and sexual experience. Kent said he "had to" ensure that Jen was not a police officer "[b]ecause [he] didn't want to get in trouble." And Kent acknowledged that engaging in "sexual stuff" with minors would be "illegal." When Officer asked Kent about the questions he had posed to Jen, Kent denied that he had asked any of them with sexual intent, explaining that he had just been "lonely" and had continued the conversation because he "[w]ant[ed] to hang out." Instead, he said that Jen had "opened th[e] door" to the "sexual parts of the conversation."

¶15    Throughout the interview, Officer expressed to Kent that he understood what Kent was going through. Later, he told Kent that a person's "psyche . . . who is willing to meet up with a 13

year old . . . build[s] over time." And he told Kent he knew this because he had been to multiple trainings "on how this works in a guy's mind." Officer said to Kent, "[Y]ou're smart enough not to say I want to have sex with a 13 year old on the phone because you don't want that as evidence. . . . That tells me that's what's going on." Kent told Officer he was "[p]artially" correct but that he "wasn't looking forward to that." Officer said, "I know that that's what happened at this point. I know that that's what was probably going to happen," and he told Kent that, in his view, Kent was only "giving [him] half truths." Both Sergeant and Officer then reassured Kent that they understood where he was coming from, but Kent remained consistent in his answers, maintaining that he "[h]onestly" "just wanted to hang out with [Jen] and talk to her." Officer then said, "I'm going to be able to tell if you lie to me because I can tell every lie that comes out of your mouth. I've been able to tell from the beginning." Officer next asked Kent, "[o]n a scale of 1 to 10," how attracted he was to "13 year old[s]." Kent rated himself a "5 maybe." He claimed "younger is more of the taste," but he attempted to clarify, "[S]exual activity with a 13 . . . year old, I'm not even seeing that. I really ain't." And he maintained that he hadn't even been "entertaining the thought of getting in her pants."

¶16    Officer then told Kent, "I can sit across from someone, based on the way they move, the way they act, and how they speak, I can tell when they're telling me the truth. And you are not right now." And Officer stated that there was "no doubt in [his] mind that if [Jen] was willing, that [Kent] would have done something sexual with her." Kent responded, "I don't know if I would have." Officer expressed skepticism that someone "who was so sexual in text messages and so willing to meet up with" a person who was "clearly a minor" would have no "thought" of "want[ing] to [do] something sexual." But Kent insisted that he only wanted simple "company" and "interaction . . . with a female," and that any physical contact would have been limited to "[v]isual contact like touching, holding and kissing hands."

Kent told Officer that he was "scared" and that he "wouldn't want [his] daughter to find out [he] was with a 13 year old." Eventually, though, Kent agreed with Sergeant that, although he "wouldn't have initiated it," he may have "been down" with "kissing and stuff." And later, Kent acknowledged that "maybe it would have gotten sexual," and he said, "I mean, it could have gone that way, yeah, sure. It could have."

¶17 While Officer went through Kent's phone, Sergeant asked Kent what he meant by his cartoon text. Kent told Sergeant that he was "not sure exactly" what he had meant but that he "was trying to get [Jen] to agree to" meet him "because [he] thought she wasn't going to come with [him] and kick it if [he] wasn't going to say something to her." Kent said he "didn't want to say anything sexual on the phone" and "didn't have plans on doing anything with" Jen, but he just thought that "if she didn't get sex from [him], she wasn't going to come and meet up with [him]." Sergeant asked Kent if sex would have occurred if Jen had been "willing," to which Kent replied, "I'm not saying it wouldn't have happened, but I'm saying that I can tell you honestly I don't know if it would have happened because I don't feel comfortable about it even talking to you."

*The Trial*

¶18 The State charged Kent with one count of enticing a minor, a second-degree felony, and the case proceeded toward trial.

¶19 Kent filed a motion to dismiss, arguing that the State had entrapped him as a matter of law. The court held an evidentiary hearing on the motion, where it heard testimony from Sergeant and reviewed the text messages, the phone calls, and Jen's online profile. Kent's attorney (Counsel) argued that the comments Detective made to Kent over the phone "were part of the enticing comments in the entrapment." Counsel also contended that the "constant[]" "comments or questions through the text messages" asking, "What are you looking for? What do you want to do?" also

pointed towards entrapment. Counsel further argued that it had been Jen (and not Kent) that brought up "oral sex," "sex," and "the topic of getting pregnant." In response, the State argued that Kent had "br[ought] up sex" and had "initiate[ed] . . . the sexual conduct of the call." The State also emphasized Kent's suggestive cartoon text and his response to Jen's pregnancy concerns.

¶20 After the hearing, the court denied Kent's motion to dismiss, concluding that Kent had not been entrapped as a matter of law and that, on the facts presented, the question of entrapment was one for the jury. In making its decision, the court observed that "[l]aw enforcement in this case did not use personalized high-pressure tactics." And the court noted that "[e]ven if . . . Kent went on the app for non-criminal reasons, when [Kent] was informed that the person he was texting with was a 13-year-old girl, [Kent] expressed interest in engaging in the alleged criminal activity without impermissible prompting or inducement." The court agreed with the State that in "looking at the totality of the circumstances," anything sexual said by Jen was just in response "to a question that was being asked by" Kent. The court also concluded that Jen "asking to clarify what it is that [Kent] means is not an unlawful inducement," especially where it was "apparent from the texts that [Kent] appear[ed] to be careful about stating things in the texts and . . . about sexual innuendoes." This, the court believed, showed that Kent was "obviously concerned about what . . . he kn[ew] would be a crime."

¶21 At trial, the State presented three witnesses—Sergeant, Detective, and Officer, and they testified consistently with the events described above. The State also submitted as evidence, among other things, Jen's dating app profile, the text messages between Kent and Jen, and recordings of the phone calls between Kent and Jen. And the State played for the jury, but did not submit as an exhibit, Kent's interview with police.

¶22 The State first examined Sergeant about his text conversations (as Jen) with Kent. Sergeant testified that he posted Jen's profile on the dating app in question because that app "was known to [police] to be a social media . . . where many men were seeking to engage in . . . relationships, sexual, with children." He testified that after he started conversations with people on the app, "[m]ost of the people that [he] had contact with" "immediately cease[d] conversing with" him "once they [found] out or believe[d] that [the persona was] 13" years old. Sergeant testified that in order for the users to verify who they are talking to, they usually "look for confirmation" through photos or phone calls. Specific to his conversation (as Jen) with Kent, Sergeant offered his view that when Kent asked Jen if she stayed at "home alone all night," "the intent of that [question]" was to "understand[] that [Jen was] 13." And when Sergeant met up with Kent, he made sure Detective was there to "verify that [Kent] did have the intent to meet with a 13 year old" and to ensure that Kent didn't just happen to be in the wrong place at the right time.

¶23 During cross-examination, Counsel specifically asked Sergeant if he was familiar with a Utah statute that makes it "illegal to impersonate an individual online with the intent to harm [and] defraud." *See* Utah Code § 76-12-206.[3] Sergeant agreed that the statute existed, but he testified that he didn't think that was "what [they] were doing in this case." Counsel also pointed out that the statute contains an exemption for law enforcement, to which Sergeant agreed. *See id.* § 76-12-206(4)(g). Counsel asked Sergeant if he knew what the term "catfishing" meant. Sergeant responded that he did, and he defined it as "posing or defrauding and scamming somebody." He also agreed that a "fake online

_____

3. After the events giving rise to this case had taken place, this statute was amended and renumbered. No party to this appeal contends that any of the relatively minor changes to this statute are material here. Thus, for convenience, we cite the current version of the statute.

identity created to begin a deceptive relationship" would fit under that definition.

¶24 On redirect, with regard to the cartoon text message Kent sent to Jen, the State asked Sergeant if he knew of any "vernacular or slang regarding a part of [the] body and a cat." Sergeant testified that it was his understanding, "[b]ased on [his] training [and] experience," that a "vagina can be referred to as a kitty, a cat, kitty-cat, such things as that." And the State specifically asked Sergeant if he had "ever heard the vernacular 'pussy' for a woman's vagina," to which he said he had. But Sergeant acknowledged, on re-cross, that Kent "didn't specifically outright say" that the cat cartoon was a reference to female genitalia.

¶25 Next, the State called Officer to testify about Kent's interview. The State asked about Officer's approach during interviews and whether "rapport building" is "important in an interview." Officer testified that rapport building is "[a]lways" important because he tries to "get to know" the interviewee so he can "relate to them in as many ways" as possible. He also stated that it is "a very common tactic . . . used since before [his] time, either not to reveal information or to lie, . . . in order to better ascertain the truth."

¶26 On cross-examination, Counsel asked Officer whether he was really "all knowing" and could "know absolutely when somebody's not telling the truth." Officer acknowledged that he did not actually possess any such ability, but he said he uses that "technique . . . on a regular basis because [he] want[s] people to believe that [he] can tell when they're lying."

¶27 Counsel also attempted to ask Officer—as he had with Sergeant—about "catfishing" and Utah's online impersonation statute. This time, the State objected, arguing that Counsel had already broached this subject with Sergeant and that it was irrelevant in any event. Counsel countered that discussing the statute was relevant because the entrapment defense "talks about

improper police conduct." Counsel acknowledged that Officer and Sergeant couldn't be charged with violating this statute due to its exemption for law enforcement, but he explained that he wanted to argue that the underlying conduct would "still [be] a crime" for anyone else. The court sustained the State's objection and barred Counsel from asking Officer about catfishing, because "there is a statute that says [Officer's and Sergeant's conduct here was] not improper."

¶28 On redirect, Officer testified that in post-detention interviews with suspects in these sorts of cases, he likes to maintain the ruse—that there really is an actual teenager involved—because he "find[s] that [he] receive[s] the truth from the suspect a lot more." And he testified that during such interviews, he often uses a technique called "stopping the denial," where he will "continue to offer the alternate excuses . . . to try and gain [the] truth." Speaking specifically about Kent's interview, Officer characterized Kent as "not very forthcoming."

¶29 After the State rested, Counsel made a motion for a directed verdict. First, he argued that the State had not presented sufficient evidence to show that Kent was "soliciting, seducing, luring, or enticing" Jen. Second, he argued that the State had not "met [its] burden" to prove that Kent "reasonably believed . . . that [Jen] was a minor." Third, he argued that Kent had been entrapped because the State initiated the sexual nature of the conversation and maintained the ruse of the "Jen" persona even after Kent was detained. The State disagreed, arguing that Kent's statements in texts and during the interview showed that Kent knew Jen was a minor and that he intended to engage in "sexual activity" with her, as "expresse[d] through the[] little cartoons" in his text message. Ultimately, the court denied Kent's directed verdict motion.

¶30 Kent then testified in his own defense. He talked about his phone calls with "Jen," and he stated his belief that the second

phone call was "tapped and that [he] was set up" because "it was echoing in the background." He also testified that he did not believe that Jen was a minor. Kent stated that Jen did not "look" or "sound" like a minor and that "[n]othing added up to her being a minor." He explained that he believed this because "[y]ou don't have a 13 year old in a sting operation." To know for sure, though, he testified that he decided to go and meet Jen. As to the cartoons in the text message, Kent insisted that they "had no sexual innuendoes at all," explaining that his phone automatically suggests emojis when he is sending a text message and that he "wasn't meaning to send" the mountain emoji. Kent also explained that he offered to have Jen come over and clean his house because he "actually needed help."

¶31 During Kent's closing argument, Counsel discussed catfishing, telling the jury that it "might be wondering why [he] talked about catfish[ing]," and explaining that it was "one of [the defense's] theories of the case." He reiterated the definition of catfishing for the jury—"catfish is someone who makes a fake account of someone on social media . . . to lure [someone else] into a relationship with a false identity"—and he argued that that is "what happened" here, emphasizing that even the officers had "admitted that the definition of catfishing applies."

¶32 The jury ultimately found Kent guilty as charged. The trial court later sentenced Kent to prison, but it suspended that sentence and placed him on probation, with conditions, including a 180-day stint in jail.

ISSUES AND STANDARDS OF REVIEW

¶33 Kent appeals his conviction, and he presents four issues for our review. First, he argues that the trial court erred in denying his motion for a directed verdict. In particular, he asserts that there was insufficient evidence to support a conclusion that he knew Jen was thirteen years old or that he intended to have sex

with her. We review a trial court's "denial of a motion for directed verdict for correctness." *State v. Palmer*, 2025 UT App 135, ¶ 27, 577 P.3d 1285 (cleaned up), *cert. denied*, 585 P.3d 46 (Utah 2026). "However, where a defendant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential to the jury verdict." *Id.* (cleaned up). In such situations, "we will uphold the [trial] court's denial if, when viewed in the light most favorable to the State, some evidence exists from which the State could prove beyond a reasonable doubt" the challenged elements of the crime. *Id.* (cleaned up).

¶34    Second, Kent challenges the trial court's order denying his motion to dismiss on the basis of entrapment. "An entrapment ruling involves a mixed question of law and fact." *State v. Dickerson* (*Dickerson I*), 2022 UT App 56, ¶ 14, 511 P.3d 1191 (cleaned up). Thus, "[w]hen considering a [trial] court's entrapment determination, we review factual findings for clear error and legal conclusions for correctness." *State v. Hernandez*, 2020 UT App 58, ¶ 4, 462 P.3d 1283. Here, Kent asked the trial court to dismiss the case, arguing that the facts of the case established entrapment as a matter of law. Such a ruling is appropriate "[o]nly when reasonable minds [can] not differ" on the question. *See State v. Haltom*, 2005 UT App 348, ¶ 7, 121 P.3d 42. Thus, a trial court's determination about whether entrapment has been established as a matter of law presents, by definition, a legal conclusion that we review for correctness. We apply that standard of review here.

¶35    Third, Kent asserts that Counsel rendered constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53 (cleaned up), *cert. denied*, 568 P.3d 264 (Utah 2025).

¶36    Finally, Kent argues that the trial court erred when it limited Counsel's cross-examination of Officer regarding catfishing. "We review a trial court's evidentiary rulings for an abuse of discretion, and we will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *State v. Gollaher*, 2020 UT App 131, ¶ 21, 474 P.3d 1018 (cleaned up).


ANALYSIS

I.  Insufficiency of the Evidence

¶37    Kent first challenges the trial court's denial of his motion for a directed verdict, asserting that—in two respects—the evidence was insufficient to support a conviction. First, he claims there was insufficient evidence to support a determination that he believed Jen was a minor. Next, he says there was insufficient evidence to support a determination that he intended to entice Jen into engaging in sexual activity with him. We address each of these contentions in turn.

A.    Jen's Age

¶38    Early in the text exchange, Jen told Kent that she was thirteen; thus, the question presented is whether there was sufficient evidence upon which a factfinder could reasonably ground a conclusion that Kent believed Jen's representation. In response to Kent's assertion that the evidence was insufficient on this point, the State directs our attention first to the text messages and phone calls, offering its view that the statements Kent made to Jen in those settings "alone suffice to show that Kent believed Jen was a minor." The State also points to statements Kent made during his post-detention interview, arguing that those statements provide "even more evidence." We agree with the

State that this evidence was more than sufficient to support the jury's determination that Kent believed Jen to be a minor.

¶39   We begin with the text messages and phone calls. Near the beginning of the text exchange, after Jen told him she was thirteen, Kent appeared disappointed, saying, "Dam that sucks I got a daughter your age." And throughout the conversation, Jen offered hints that supported her representation that she was thirteen. For instance, she told Kent she lived with her mother and was "in middle school." And during a phone call, Jen told Kent she couldn't talk long because she was at school right then. Many of Kent's responses tended to indicate that he believed Jen's representation about her age; for instance, Kent told Jen that he "like[d] younger chicks," and he asked Jen whether it was "common for *kids* [*her*] *age* to be having sex." (Emphasis added.) At one point, he asked Jen whether she would be "home alone all night," a query Sergeant believed indicated that Kent believed Jen to be a minor.

¶40   Especially damning for Kent in this regard are his repeated comments expressing concern about police involvement in the situation. On two occasions during the text exchange, Kent asked Jen to promise him she was not working with the cops. And on other occasions, Kent seemed reluctant to expressly discuss, over text, the particular sexual activities they might engage in if they were to meet, because he was worried about the potential consequences of engaging in such activities with a minor. If Kent truly believed that Jen was nineteen years old, as her profile indicated, he would not have been concerned about the potential legal consequences of discussing sexual activity.

¶41   Finally, many of the statements Kent made to officers during his interview also supported the conclusion that he believed Jen to be a minor. During the interview, Kent told Officer he understood why Jen's "mom" would be upset about their conversation because he also had a thirteen-year-old daughter.

And he made statements indicating that Jen was "[a]lmost the same age as [his] daughter"—"13, almost 14" years old. He even stated that he "wouldn't want [his] daughter" "to find out [he] was with a 13 year old." He also told police that "[o]n a scale of 1 to 10" he would rate himself a "5 maybe" on how attracted he was to "13 year old[s]." Lastly, he explained to Officer that he had inquired if Jen was a cop "[b]ecause [he] didn't want to get in trouble" for engaging in "illegal" "sexual stuff" with a minor. We therefore agree with the State that Kent's statements—made in text messages, phone calls, and during the interview—provide strong evidence that Kent believed Jen to be a minor.

¶42 Kent resists this conclusion for two reasons. First, he argues that he only acknowledged Jen's age after the police had first mentioned Jen's age and said that her angry mother had contacted the police. But this argument does not account for the statements Kent made before the interview began. The text messages alone provide strong evidence that Kent knew and understood Jen's age, as well as the consequences associated with engaging in sexual activity with a thirteen-year-old girl. And Kent's argument also does not account for the fact that at no point during the interview did Kent claim that he disbelieved Jen's assertion that she was a minor. In fact, all of his interview statements "assumed, as a premise, that [Jen] was a young minor." *See State v. Dickerson* (*Dickerson II*), 2025 UT App 173, ¶ 23, 582 P.3d 1219, *cert. denied*, 585 P.3d 47 (Utah 2026).

¶43 Second, Kent asserts that he could not have reasonably believed Jen was a minor because the photos and voice used to represent her belonged to adults, and because Jen "claimed sexual experience in language unusual" for a minor. This argument is reminiscent of the argument made by the defendant in *Dickerson II*. *See id.* ¶ 26. There, the defendant argued that because the online profile picture was of an adult woman, "neither he nor any reasonable person in his position would have believed that [the persona] was anything other than an adult." *Id.* We rejected that

argument, stating that "the question isn't whether a reasonable person in [the defendant's] position believed [the persona] was thirteen; instead, the question is whether [*the defendant*] believed she was thirteen." *Id.* ¶ 27 (emphasis added). So too here. Regardless of Jen's photos, voice, or claimed sexual experiences, the statements Kent made during the text messages, phone calls, and interview provide strong evidence that Kent believed Jen to be a minor, even if we assume—for purposes of the argument only—that a reasonable person may not have.

¶44 Thus, the trial court correctly concluded, on this record, that at least "some evidence exist[ed] from which the State could prove beyond a reasonable doubt" that Kent believed Jen to be a minor. *See State v. Palmer*, 2025 UT App 135, ¶ 27, 577 P.3d 1285 (cleaned up), *cert. denied*, 585 P.3d 46 (Utah 2026).

B.     Intent

¶45 The statute under which Kent was charged states that, to commit enticement, an actor must "knowingly . . . use[] an electronic communication . . . to . . . solicit, seduce, lure, or entice a minor . . . to engage in sexual activity that is a violation of state criminal law." Utah Code § 76-5-417(2).[4] Kent argues that the evidence was insufficient to prove that he "attempted to solicit, seduce, lure, or entice" Jen into engaging in illegal sexual activity with him. We disagree because, again, the text messages clearly contain at least some evidence in support of this conclusion.

¶46 At one point during the text exchange, Kent invited Jen to come over and clean his house. On its face, that offer was innocent enough, but it came accompanied with sexual undertones. When Jen told Kent she wasn't interested in cleaning his house, he

---

4. After the events giving rise to this case had taken place, this statutory section was renumbered, but no material changes were made to the relevant statutory text. We therefore cite the current version of the statute for convenience.

replied, "I'm thinking if you were to give it a try you might end up pretty happy." And when Jen showed interest in that, Kent told her that she'd have to come over so that he could show her what he needed done and so that they could discuss what he would pay her for those services. When discussing whether it might work for Jen to come over, Kent remarked that they "would only have like a half [hour]" and told her they would "need allot more time than that . . . if [it was] going to be any kind of fun" and that "good things come to those who wait." These messages presented at least some evidence that Kent was attempting to lure Jen to his house for sexual activity through the guise of cleaning.

¶47 And the cartoon text more or less clinches the matter. Kent sent that text in response to Jen's queries about what sorts of activity he had in mind. And while Kent later claimed that he hadn't meant to send the mountain image and that the cartoon text "had no sexual innuendoes at all," a factfinder could readily disbelieve this assertion and reach the opposite (and quite intuitive) conclusion. Sergeant testified—just in case any jurors were not already aware—that an image of a cat represents a "vernacular or slang" term for a "woman's vagina." This text message—especially considered in context with the entirety of the text exchange—constituted strong evidence that Kent knowingly enticed Jen to engage in illegal sexual activity.

¶48 Kent disagrees, asserting that his "expressions of intent were inconclusive at best." But even assuming, for argument's sake, that evidence of Kent's intent regarding enticement was truly inconclusive because evidence cut both ways, all that means is that the matter was properly presented to the jury. After all, matters for which competent evidence exists on both sides present valid jury questions. Perhaps a reasonable jury could have decided this assertedly inconclusive question in Kent's favor. But a directed verdict on this point is inappropriate so long as some evidence supports conviction. And here, there is strong evidence—in the form of Kent's texts—that supports the jury's

ultimate determination that Kent knowingly enticed Jen to participate in illegal sexual activity.

¶49 For these reasons, we conclude that, on both challenged points, sufficient evidence existed to support the jury's verdict. On that basis, we reject Kent's challenges to the trial court's denial of his directed verdict motion.

## II. Entrapment as a Matter of Law

¶50 Next, Kent challenges the trial court's denial of his motion to dismiss, in which he asserted that the case should be dismissed because the officers' conduct constituted entrapment as a matter of law. In response, the State raises two points. First, it asks us to make a procedural clarification that, in this situation, where the jury rejected Kent's entrapment defense as a matter of fact, the question presented is not whether the trial court properly denied the motion to dismiss *prior to trial* but is, instead, whether the State presented sufficient evidence *at trial* to disprove the entrapment defense. Second, the State resists Kent's assertion on its merits, contending that the evidence presented "amply demonstrated that Kent was not entrapped" as a matter of law. We reject the State's first contention, but we agree with the second.

### A. Procedural Clarification

¶51 The State contends that "when a jury rejects an entrapment defense and finds a defendant guilty at trial, any error made in denying dismissal *prior to trial* is harmless." And it contends that "the only remaining question is whether the evidence *at trial* was sufficient to disprove the [entrapment] defense." In our view, the State's point is not well taken.

¶52 The question of whether to take the entrapment issue away from the jury is always going to be a question of law, no matter the point in time at which the inquiry is made. After all, it is "[o]nly when reasonable minds could not differ [that we can] find

entrapment as a matter of law." *State v. Haltom*, 2005 UT App 348, ¶ 7, 121 P.3d 42. A trial court may not grant a pretrial motion to dismiss on entrapment grounds unless it determines, as a matter of law, that reasonable minds could not differ on the question. *See id.* And a trial court may grant a defendant's motion for a directed verdict on the question of entrapment, after the matter has been presented to the jury, only if the evidence presented at trial supports but one reasonable conclusion: that the defendant was entrapped. Indeed, "if there is any evidence, however slight or circumstantial, which tends to show guilt of the crime charged," the court must "submit the case to the jury." *See State v. Montoya*, 2004 UT 5, ¶ 33, 84 P.3d 1183 (cleaned up).

¶53    The only question here, from a procedural standpoint, is whether we evaluate the sufficiency of the evidence as of the time the trial court made its decision to deny the motion to dismiss (which would involve an examination of the evidence presented to the court in connection with the motion) or as of the conclusion of the trial (which would involve an examination of all the evidence presented at trial). On this question, we think it best to evaluate the propriety of the trial court's ruling as of the time the court made the ruling, and that inquiry necessarily involves an assessment of the sufficiency of the evidence presented to the court at the time. *See Boyd v. San Pedro, L.A. & S.L.R. Co.*, 146 P. 282, 284 (Utah 1915) ("[W]e are required to consider only that evidence and the record before the court at the time . . . the ruling was made."); *accord Gallegos v. One Commerce Street, LLC*, 2025 UT App 196, ¶ 10 n.5, 585 P.3d 651; *see also Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1022 (10th Cir. 2002) ("Our examination on review is confined to an examination of materials before the lower court at the time the ruling was made." (cleaned up)). Indeed, the entrapment statute appears to contemplate that the decision about dismissal should—or at least can—be made by the court prior to trial, based on information presented to it at the time. *See* Utah Code § 76-2-303(5) (stating that, if "the court determine[s] that the defendant was entrapped, it shall dismiss the case with prejudice,

but if the court determines the defendant was not entrapped, such issue may be presented by the defendant to the jury at trial").

¶54 We therefore disagree with the State's position that the jury's verdict "cured" any potential error in the trial court's pretrial ruling denying the motion to dismiss.[5] After all, if the court had dismissed the case prior to trial, the jury would never have had the opportunity to convict Kent.

B. The Merits of Kent's Entrapment Argument

¶55 We therefore turn to the merits of the question, namely, whether the trial court properly denied Kent's pretrial motion to dismiss, based on the evidence presented to it at the time.

¶56 In this case, the procedural issue raised by the State (and discussed immediately above) turns out not to matter all that much, because the evidence the court considered in evaluating Kent's motion to dismiss was largely the same as, and simply a subset of, the evidence the jury later considered in rendering its verdict. Recall that after Kent filed his motion to dismiss, the trial court held an evidentiary hearing, at which it heard testimony from Sergeant and reviewed the texts, the phone calls, and Jen's online profile. Sergeant's testimony was not materially different, as concerns entrapment, at the evidentiary hearing than it was

---

5. The State supports its argument with citations to cases involving potential error in a charging document or in a probable cause determination. *See Thomas v. State*, 2002 UT 128, ¶ 7, 63 P.3d 672; *see also State v. Fretheim*, 2014 UT App 210, ¶ 7, 335 P.3d 374 ("Any error in a probable cause determination becomes moot once a defendant has been convicted under the much more stringent requirements of proof at trial, where stronger constitutional and evidentiary safeguards have been employed to protect the defendant." (cleaned up)). In our view, those cases arise in an entirely different context and are not applicable here.

later at trial. And the documentary evidence—texts, calls, and online profile—was exactly the same as at trial.

¶57 Based on that evidence, the court determined that the entrapment issue presented a jury question and that it could not be resolved in Kent's favor as a matter of law. We discern no error in the court's decision.

¶58 "Entrapment occurs when a peace officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it." Utah Code § 76-2-303(1). But "[c]onduct merely affording a person an opportunity to commit an offense does not constitute entrapment." *Id.* In assessing an entrapment issue, "we ask whether the government's methods create a substantial risk of inducing the commission of a crime despite a person's lack of initiative or desire to commit it." *Dickerson I*, 2022 UT App 56, ¶ 35, 511 P.3d 1191 (cleaned up). And we undertake this inquiry "by looking through the lens of the objective standard—focusing on the government's conduct." *State v. Hernandez*, 2020 UT App 58, ¶ 11, 462 P.3d 1283.

¶59 "Entrapment is a highly fact-intensive inquiry." *State v. Qayum*, 2025 UT App 178, ¶ 32, 582 P.3d 1245 (cleaned up), *cert. denied*, 585 P.3d 47 (Utah 2026). In undertaking this analysis, courts are to consider the totality of the evidence surrounding the alleged entrapment, including "the transactions leading up to the offense, the interaction between the agent and the defendant, and the response to the inducements of the agent." *Id.* (cleaned up); *see also Dickerson I*, 2022 UT App 56, ¶ 36 (stating "that the entire course of conduct must be considered in assessing the effect that the government's methods would have on a person not otherwise ready to commit the crime"). "Entrapment is established as a matter of law when an entrapment defense—asserting the offense

was impermissibly induced—is sure to leave *all* reasonable minds reasonably doubting whether the commission of the offense was the product of a defendant's inclination." *Hernandez*, 2020 UT App 58, ¶ 6. But "if reasonable minds could differ on whether or not entrapment occurred, the court must deny the motion and allow the issue of entrapment to go to the jury." *Qayum*, 2025 UT App 178, ¶ 32 (cleaned up).

¶60   Cases in which entrapment can be established as a matter of law are relatively rare, and historically they have fallen into "two types of cases." *See Dickerson I*, 2022 UT App 56, ¶ 37. The first involves "improper police conduct in which the government agent applied persistent pressure or persistently pursued the defendant to commit the crime." *Id.* (cleaned up). The second involves "appeals based on sympathy, pity, or close personal friendships, or offers of inordinate sums of money." *Id.* (cleaned up). None of these specific methods were employed by the officers here, and regardless of whether their actions fit into either of these two categories of cases, their actions did not constitute entrapment as a matter of law.

¶61   Neither Sergeant nor Detective offered Kent any money at all, let alone "inordinate sums." *See id.* (cleaned up). Neither made any pleas to sympathy or pity, nor did they persistently pursue Kent in an effort to induce him to commit a crime. Indeed, the facts indicate quite the opposite—it was Kent who pursued the conversation with Jen over the course of several days, injected it with sexual innuendo, and continued it even after Jen gave him numerous opportunities to back out. For example, Kent did not end the conversation after learning that Jen was thirteen, nor did he end it when he learned she was in middle school. He also continued the conversation even after Jen said things like, "I won't tell u more if don't want," "Ok if you don't want me to be [interested] I won't," and "[I]f you don't want [something physical] then that's cool." But even after each of these "outs," Kent continued the conversation. This evidence indicates that

Kent wanted to pursue the conversation of his own accord and not because he was entrapped to do so.

¶62     Indeed, the type of persistent police pressure that has been considered improper conduct in previous cases, *see, e.g.*, *State v. Kourbelas*, 621 P.2d 1238, 1240 (Utah 1980), did not take place in Kent's case. To be sure, Sergeant (acting as Jen) did ask Kent what he was interested in doing with her, and those requests became more frequent toward the end of the conversation. But in context, those requests did not constitute improper police pressure, because they were preceded by actions on Kent's part that strongly indicated an independent willingness to explore sexual topics with Jen. For instance, Kent brought up the possibility of sex with Jen in the first instance, stating that he was "down for whatever." And after Jen told Kent she was "lookin to hook up with a cool older guy," it was Kent that then escalated the conversation by asking about Jen's sexual experience. Moreover, Kent was often evasive when asked about his specific intentions, which naturally prompted Jen to ask follow-up questions about what exactly Kent wanted to do with Jen. For instance, when he asked Jen to clean his house and said she "might end up pretty happy," Jen wanted to know what that meant. But when she asked for clarity, Kent told her that she'd have to come over so he could "show [her] what [he needed] done" and so they could discuss "what [he would] pay" for those services. And when Jen was on the way to meet Kent, she asked multiple times what they would do once she got there. In response, Kent told her that he didn't want to "talk about what we're going to do on the phone," that he was not "saying s*** on this stupid ass communication device," and that he was "down to give [Jen] whatever [she] want[ed]." He also sent her the cartoon text to describe what he wanted to do with her. In context, Sergeant's behavior falls well short of the sort of "excessive pressure or goading" that qualifies as entrapment as a matter of law. *See Dickerson I*, 2022 UT App 56, ¶ 44 (cleaned up).

¶63    Kent pushes back on several grounds. First, he asserts that Sergeant induced him to commit a crime that he was not otherwise ready to commit when Sergeant created "a powerfully alluring mythical character" that was "neither minor nor adult." He argues that because Sergeant used a photo of an adult and had Detective—with an adult voice that spoke of adult sexual experiences—operate the phone calls, Sergeant's "tactics were improperly calculated to arouse desire, overpowering curiosity, and affection." These arguments could certainly be made to a jury during trial. But we disagree that they amount to entrapment as a matter of law.

¶64    In this same vein, Kent suggests that Jen's attractiveness to Kent should factor into the entrapment analysis. But "as regards sexual crimes, the attractiveness of the putative victim should not be viewed as a material factor in an entrapment analysis." *Qayum*, 2025 UT App 178, ¶ 42 n.6 (cleaned up). This is because "a defendant's attraction to the putative victim is a baseline feature of almost every case and is thus best viewed as simply a part of any normal opportunity to commit the offense." *Id.* Again, this argument could in theory be made to a jury. But it is not a material factor that leads to a conclusion that a person in this situation was entrapped as a matter of law.

¶65    Finally, Kent contends that Sergeant "repeatedly minimized, normalized, and downplayed the harm" of a possible sexual relationship with Jen. He points to Jen suggesting she was "lookin to hook up with a cool older guy" and that "his age doesn't matter." He also points to her claimed sexual experience with another adult man. Kent contrasts these texts with the circumstances in *State v. Smith*, where the decoy "offer[ed] to perform sex acts . . . as a reluctant form of compensation," instead of something that both parties were interested in. 2024 UT 13, ¶ 42, 548 P.3d 874. But even in *Smith*, the decoy was a willing participant in the illicit activity, she just had different reasons for wanting to participate. *See id.* ¶ 1 (stating that the decoy's motive

was to "perform multiple sex acts in exchange for [defendant] driving her to California"). And the text messages between Jen and Kent illustrate that Kent was well aware of the illegal nature of any sexual relationship with Jen. In this case, even assuming—for purposes of the discussion—that Sergeant attempted to improperly downplay the seriousness of a sexual relationship with a minor, there is strong evidence indicating that Kent didn't fall for this tactic and remained acutely aware of the criminal nature of pursuing a sexual relationship with Jen.

¶66 For all of these reasons, Sergeant "did not employ inducements that would have been, as a matter of law, sufficient to induce an ordinary person, not otherwise inclined, to solicit sex from a thirteen-year-old." *See Dickerson I*, 2022 UT App 56, ¶ 47 (cleaned up). The police conduct here did not constitute entrapment as a matter of law, because reasonable jurors could conclude, based on the evidence, that the police "merely afford[ed] [Kent] an opportunity to commit" the offense. *See* Utah Code § 76-2-303(1). Thus, "reasonable minds could differ on whether or not entrapment occurred." *Qayum*, 2025 UT App 178, ¶ 32 (cleaned up). Accordingly, the court did not err in denying Kent's motion to dismiss on entrapment and referring the matter to the jury for determination.

### III. Ineffective Assistance of Counsel

¶67 Next, Kent asserts that Counsel rendered constitutionally ineffective assistance. To succeed on such a claim, Kent must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469

P.3d 871. Failure to prove either component is fatal to the claim; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶68 In evaluating the reasonableness of an attorney's performance, courts will often look to whether the attorney's actions could have been motivated by trial strategy. *See Scott*, 2020 UT 13, ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34; *see also Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

¶69 Here, Kent argues that Counsel rendered ineffective assistance in two respects. First, he takes issue with Counsel's failure to object to several parts of Officer's testimony in which Officer discussed Kent's credibility. Second, he takes issue with Counsel's failure to object to other parts of both Sergeant's and Officer's testimony in which they discussed Kent's intent.[6] We

---

6. In reviewing Kent's briefing, we struggled to determine exactly which statements Kent was taking issue with on appeal. To meaningfully evaluate an argument in which certain statements are challenged, "we of course need to know what those statements

(continued…)

address each category of statements in turn, and we ultimately conclude that Counsel did not perform deficiently.

A.     Statements About Truth

¶70   Kent first asserts that some of Officer's statements at trial constituted "inadmissible opining on Kent's credibility," barred by rules 608 and 702 of the Utah Rules of Evidence. And he asserts that Counsel rendered ineffective assistance by not objecting to this testimony. In particular, Kent points to the following statements as objectionable, some of which come from Officer's trial testimony and some of which come from statements Officer made during the custodial interview of Kent:

- Officer testifying at trial that he "find[s] that [he] receive[s] the truth from the suspect a lot more" when he maintains the ruse that there is a real minor involved.

- Officer testifying at trial that "stopping the denial" is "the best avenue to try and gain the truth."

- Officer stating, during the interview, "I'm going to be able to tell if you lie to me because I can tell every lie that comes

---

are," and that is most easily done when "a comprehensive list of the statements" is provided. *See Davidson v. Baird*, 2019 UT App 8, ¶ 27, 438 P.3d 928. We have done our best to determine which statements about credibility Kent intends to challenge. As for the statements about intent, we note that the State—in an effort to respond to Kent's arguments—compiled a list of statements to which it believes Kent is objecting. Kent, in his reply brief, did not appear to take issue with the State's list. We appreciate the State's effort, and we use it as a template for our own analysis. We note that future litigants who wish to challenge particular statements on appeal "would be well-served by including . . . a list or other specific identification of the particular statements alleged to be [at issue on appeal]." *Id.* ¶ 27 n.4.

out of your mouth. I've been able to tell from the beginning," and "I can tell when they're telling me the truth. And you are not right now."

- Officer testifying at trial that Kent was "not very forthcoming" in his interview.

- Officer, during the interview, accusing Kent of lying.

¶71 As an initial matter, we can take off the table four of the five challenged statements—the ones concerning police tactics during the interview—because there was a clear strategic reason Counsel may have had for wanting the jury to hear those statements: Counsel could reasonably have wanted the jury to see and understand the extent of the pressure the officers applied to Kent during the interview so that he could argue that Kent's denials in the face of that pressure were all the more credible. We reached a similar conclusion in *State v. Gourdin*, 2024 UT App 74, 549 P.3d 685, *cert. granted*, 564 P.3d 958 (Utah 2025). In that case, officers applied significant pressure to the defendant during his police interview, allegedly distorting the defendant's statements and lying to the defendant about the state of the evidence, among other things. *See id.* ¶ 63. On appeal, the defendant asserted that his attorney had performed deficiently by not objecting to the admission, at trial, of some of the statements made by the officers during the interview, and by not attempting to seek redaction of the interview. *See id.* ¶ 61. We rejected this argument, concluding that the attorney "had good reason to choose not to make" the suggested objections, because "a reasonable attorney could very well have wanted the jury to hear about the officers' tactics in order to make [the defendant's] consistent denials in the face of these tactics seem even more believable." *Id.* ¶ 63.

¶72 The same circumstances exist here. During his interview, Kent continuously denied that he was interested in a sexual relationship with Jen, and he consistently maintained that he "just wanted to hang out with her and talk to her." Even after Officer

told Kent that he knew Kent was lying, Kent maintained that he hadn't even been "entertaining the thought of getting in [Jen's] pants." As in *Gourdin*, Counsel could have reasonably decided, as a matter of strategy, to allow the jury to hear the entirety of the police tactics, even if some of the statements Officer made were objectionable. Thus, Kent has not demonstrated that Counsel performed deficiently by not objecting to such statements.

¶73 This leaves only one remaining statement for consideration: Officer's trial testimony that Kent was "not very forthcoming" in his interview. As Kent sees it, this statement constituted improper commentary on another witness's truthfulness because it involved Officer offering an opinion to the jury that Kent had been lying to him during the interview.[7] Indeed, although rule 608(a) "permits testimony concerning a witness's general character or reputation for truthfulness or untruthfulness," it "bars direct testimony regarding the truthfulness of a witness on a particular occasion." *See Provo City v. Bishop-Garcia*, 2022 UT App 16, ¶ 20, 505 P.3d 81 (cleaned up).

¶74 Had Officer clearly indicated that he was offering an opinion about Kent's truthfulness during the interview, that statement would indeed be objectionable. But the "not very forthcoming" statement is subject to an alternative interpretation: that Officer merely believed that Kent had been guarded in his replies and had chosen not to excessively volunteer information.

---

7. Officer's statements, made during the interview directly to Kent, that Officer could tell that Kent was lying do not fall into this category, because Officer—during his testimony at trial—disavowed any notion that he was attempting to offer an opinion as to Kent's truthfulness during the interview, as well as any notion that he had truth-telling powers. He explained that he had simply been applying an interview technique. And, as already noted, Counsel had a strategic reason for forgoing any objection to these statements about interview techniques.

As one federal appellate court has explained, "[t]he most common definition of 'forthcoming' concerns an individual's willingness to divulge information." *United States v. Jones*, 74 F.4th 1065, 1071 (10th Cir. 2023) (citing definitions); *see id.* ("[I]t simply means that they are not willing to talk."). To describe a witness as not "forthcoming" "means that he or she is [not] willing to speak, not that he or she is [not] being truthful." *Id.* So it follows that "it is perfectly sensible to refer to someone who refuses to speak as 'not forthcoming,' and this would not mean that the silent individual is a liar." *Id.* Here, Counsel could have interpreted Officer's remark as having little or nothing to do with Kent's credibility and much more to do with his level of chattiness. In our view, such an interpretation was reasonable, and on that basis Counsel could have reasonably opted not to lodge an objection to Officer's statement that Kent was "not very forthcoming."

¶75 We therefore conclude that Kent has not demonstrated that Counsel performed deficiently by not objecting to the five identified statements regarding Kent's veracity.

B.      Statements About Intent

¶76 Next, Kent claims that Counsel rendered ineffective assistance by not objecting to other parts of both Sergeant's and Officer's testimony in which they discussed Kent's intent. He argues that Counsel should have lodged objections under rules 704 and 702 of the Utah Rules of Evidence. We find Kent's arguments unpersuasive and conclude that Counsel did not perform deficiently by opting not to lodge these objections.

¶77 The statements that are apparently at issue here are these[8]:

---

8. As noted, this list of statements was taken from the State's brief, and Kent did not disagree with this list. *See supra* note 6.

- Sergeant's testimony that when Kent asked if Jen stayed at "home alone all night," "the intent of that [question]" was to "understand[] that [Jen was] 13."

- Sergeant's testimony that he made sure Detective was there when they met with Kent in order to "verify that [Kent] did have the intent to meet with a 13 year old" and to ensure that Kent didn't just happen to be in the wrong place at the right time.

- Sergeant's testimony that he posted Jen's profile on a particular app because that app is "known to [police] to be a social media . . . where many men were seeking to engage in . . . relationships, sexual, with children."

- Sergeant's testimony that most of the individuals that police speak with on apps "look for confirmation" through photos or phone calls to verify who they are talking to.

- Sergeant's testimony that "[m]ost of the people that [he] had contact with" in this context "immediately cease[d] conversing with" him "once they [found] out or believe[d] that [the persona was] 13" years old.

- Officer's statement, made to Kent during the police interview, that Officer was skeptical that someone "who was so sexual in text messages and so willing to meet up with" a person who was "clearly a minor" would have no "thought" of "want[ing] to [do] something sexual."

¶78 Kent argues that Counsel should have lodged an objection, grounded in rules 704 and 702, because, in Kent's view, these statements constituted expert testimony about whether Kent had the requisite mental state for conviction. The first subsection of rule 704 provides that, as a general matter, "opinion [testimony] is not objectionable just because it embraces an ultimate issue" in the case. Utah R. Evid. 704(a). But the rule's second subsection

contains an important caveat: it prohibits "an expert witness" in a criminal case from offering "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," because "[t]hose matters are for the trier of fact alone." *Id.* R. 704(b). But Kent's arguments here are misplaced, because Counsel could have reasonably believed that none of the statements at issue here constituted opinions from an expert witness about Kent's mental state, and therefore that admission of the statements did not violate either rule 704 or rule 702. This is so for two related reasons.

¶79 First, Counsel could have reasonably believed that neither Sergeant nor Officer was testifying as an expert witness but that, instead, these witnesses—who had percipient knowledge of the events in question—were merely offering their own personal observations about their investigation of Kent's case. Rule 702 governs the admissibility of expert testimony, and it allows "a witness who is qualified as an expert . . . [to] testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* R. 702(a). Rule 701, by contrast, governs the admissibility of lay testimony, and it allows a "lay witness . . . [to] offer an opinion about matters that are 'rationally based on the witness's perception,' helpful to the jury in 'determining a fact in issue,' and 'not based on scientific, technical, or other specialized knowledge.'" *State v. Hulse*, 2019 UT App 105, ¶ 32, 444 P.3d 1158 (quoting Utah R. Evid. 701). All the statements at issue here were being offered in the context of Sergeant and Officer describing their investigation of Kent, including their interview with him. These witnesses were offering their personal observations of events they participated in. Under these circumstances, Counsel could reasonably have concluded that their testimony did not fall under rule 702's purview at all and that rule 704(b)'s language regarding expert witnesses therefore didn't apply either.

¶80 Second, Counsel could also have reasonably assumed that none of these statements constituted an opinion about Kent's mental state in committing the acts in question. The first five statements—the ones made by Sergeant—were either simply descriptions of Sergeant's own mental state in asking certain questions of Kent or statements about Sergeant's experience in conducting similar investigations of others. None of these statements had much of anything to do with Kent's own mental state; they did not reflect any opinion on Sergeant's part as to whether Kent possessed the requisite intent at the time he committed the acts in question. Or at least Counsel could have reasonably so believed. *See State v. Hosman*, 2021 UT App 103, ¶¶ 26, 29, 496 P.3d 1162 (observing that "factual testimony" from officers about how they "proceeded with their investigation" was "not an opinion about whether [the defendant] did or did not have a mental state or condition that constitutes an element of the crime charged" (cleaned up)).

¶81 And the sixth statement—the one made by Officer during his interview with Kent—also did not constitute an opinion on Kent's mental state. At trial, the State played a recording of Kent's police interview, and the jury heard Officer express skepticism that someone "who was so sexual in text messages and so willing to meet up with" a person who was "clearly a minor" would have no "thought" of "want[ing] to [do] something sexual." This statement was made by Officer when he was attempting to get Kent to confess during his interview. During his trial testimony, Officer explained that, during the interview, he had used various "tactic[s]" in an attempt to get Kent to talk about the events in question. Testimony like this can be of assistance to a factfinder in assessing a defendant's mental state, but it is inaccurate to characterize this statement as an opinion from Officer as to what Kent's mental state actually was. Under the circumstances, Counsel could have reasonably believed that this statement was not violative of rules 704 and 702.

¶82    For these reasons, Kent has not demonstrated that Counsel performed deficiently by not objecting to these statements. Thus, we reject Kent's claims of ineffective assistance of counsel.

## IV.  Evidence About Catfishing

¶83    Finally, Kent challenges the trial court's evidentiary ruling limiting his examination of Officer regarding catfishing. Kent asserts that the evidence was relevant and that its exclusion was prejudicial because it "left a factual gap in the defense theory." We resolve this matter on harmless error grounds because even assuming—for purposes of the discussion—that the court's ruling was erroneous, any error was harmless here.

¶84    Not every error regarding the admission of evidence requires reversal. Indeed, such errors "require[] reversal only if a review of the record persuades the appellate court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *State v. Jones*, 2020 UT App 161, ¶ 14, 478 P.3d 1055; *see also State v. Leech*, 2020 UT App 116, ¶ 43 n.7, 473 P.3d 218 ("[T]he showing of prejudice required to establish that preserved errors are harmful is indistinguishable from the showing of prejudice required to establish plain error or ineffective assistance of counsel for unpreserved errors."). "Prejudicial error thus occurs when there is a reasonable probability that but for the alleged errors, the result of the proceeding would have been different." *State v. Martinez*, 2021 UT App 11, ¶ 30, 480 P.3d 1103 (cleaned up). "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86. And in assessing prejudice, we may consider several factors, including "the importance of the complained-of evidence to the prosecution's case, whether that evidence was cumulative, and

the overall strength of the prosecution's case." *State v. Shepherd*, 2015 UT App 208, ¶ 28, 357 P.3d 598.

¶85 Here, the testimony Counsel sought to elicit from Officer was cumulative. Counsel had already elicited essentially the same testimony from Sergeant—that there exists a Utah statute regarding online impersonation, *see* Utah Code § 76-9-203, and that under that statute it is "illegal to impersonate an individual online with the intent to harm [and] defraud." Sergeant agreed with Counsel that a "fake online identity created to begin a deceptive relationship" would fit under the definition of "catfishing." But Sergeant also discussed the statute's exception for law enforcement activity. The State did not lodge an objection to Counsel's questioning of Sergeant. Later, Counsel tried to broach the same subject with Officer, and this time the State objected. But the jury had already heard the evidence once. Under the circumstances, we are unpersuaded that the outcome of the trial would have been at all different had the jury heard another witness discuss, for a second time, Utah's online impersonation statute. *See State v. Miranda*, 2017 UT App 203, ¶ 47, 407 P.3d 1033 ("Indeed, when erroneously admitted evidence is cumulative of evidence already before the factfinder, the error may be considered harmless.").

¶86 And this conclusion is bolstered by the fact that, during closing argument, Counsel discussed the online impersonation statute, explaining that it was one of Kent's "theories" for the case. Counsel argued that Sergeant had "catfished" Kent, and he emphasized that even Sergeant had "admitted that the definition of catfishing applies." So although the jury was not able to hear Officer (in addition to Sergeant) testify about catfishing, the jury heard the evidence Counsel sought to elicit, and Counsel was able to make arguments based on that evidence.

¶87    Accordingly, Kent was not prejudiced by any error the trial court might have made regarding the limitations it placed on Counsel's cross-examination of Officer.

CONCLUSION

¶88    The trial court did not err in denying Kent's directed verdict motion, because there was sufficient evidence to support the jury's verdict. The court likewise did not err when it denied Kent's motion to dismiss based on entrapment. We reject Kent's ineffective assistance claims because Kent has not demonstrated that Counsel performed deficiently. And finally, Kent has not demonstrated that he was prejudiced by any error the court might have made in limiting Counsel's cross-examination of Officer regarding catfishing. On these bases, we reject all of Kent's appellate arguments and affirm his conviction.

_____